OPINION *Page 2 
{¶ 1} Appellant Mary Summers ("Summers") appeals the decision of the Muskingum County Common Pleas Court following a bench trial which granted judgment in favor of Appellee Carol Goff ("Goff") and awarded prejudgment interest.
 {¶ 2} This case arises out of a home construction contract. Goff is a home builder. She first built a home for Summers in 2000. On March 12, 2002, Summers again contracted with Goff to build another home. This home was a "Lyndhurst Lodge" model located on a lot in the Summerwood subdivision in Zanesville, Ohio. The contract price was $269,000.00. Goff agreed to complete the house by January 31, 2003.
 {¶ 3} Specifically, the construction contract stated:
 {¶ 4} "The Owner agrees to pay to the Contractor for her performance hereunder (price does not include lot) Two hundred sixty nine thousand dollars ($269,000) less charges authorized hereby, (provided the Subcontractor has complied in all respects with this Contract), in installments as work progresses, and less 10% to be retained until completion."
 {¶ 5} The contract further provided that the house would be paid for in installments, as follows:
 {¶ 6} "$90,000.00 down at signing contract"
 {¶ 7} "$90,000.00 down when trusses are delivered"
 {¶ 8} "$25,000.00 heating roughed in wiring roughed in"
 {¶ 9} "$29,000.00 drywall hung"
 {¶ 10} "$25,000.00 brick" *Page 3 
 {¶ 11} "$10,000.00 floor covering".
 {¶ 12} The construction contract also permitted Summers to withhold 10%, or $26, 900, until completion of the home and upon release of mechanics' liens.
 {¶ 13} Three days after signing the contract, Summers went to Goff and informed her she had purchased a different lot located in the Blackwood subdivision, also in Zanesville. Trial T. at 25. Summers also wanted a different house plan designed by Edsel Breland. Id. The parties did not execute a new contract. T. at 89-90. Goff lined through "Summerwood" and wrote in "Blackwood" subdivision and lined though "Lyndhurst Lodge" but did not replace the model with another model. T. at 23-25. Goff kept the same price for the house despite the size difference in the plans. T. at 89. She did not alter the move-in date. T. at 89-90. Goff stated at trial that with the lot and house plan changes the January 31, 2003 move-in date was "impossible". T. at 89. She advised Summers that the construction schedule was going to change due to the different house plan. T. at 104.
 {¶ 14} Goff proceeded with the construction of the house. Summers rented a condominium during the construction of the house. T. at 124. Goff and Summers went to Zanesville Fabricators together to choose kitchen cabinets at least twice. T. at 55. Goff believed the cabinets had been chosen. T. at 77. Summers then went to Zanesville Fabricators at least eight to twelve times by herself. T. at 56. Summers kept changing her mind regarding the style of cabinet. T. at 57. Upon installation, Goff realized the cabinets installed were not the ones Summers had picked out in her presence. T. at 77. Summers then claimed the cabinets were not the ones she picked out. T. at 19. Goff stated Summers wanted her to rip them out and she was very angry. *Page 4 
T. at 78. Tom Nash with Zanesville Fabricators testified that there was there was no doubt in his mind that the cabinets installed were the ones Summers chose and that the cabinets were very similar in price. T. at 57.
 {¶ 15} Summers also requested upgrades in the lighting. After much shopping, Summers chose special order light fixtures from Belden Lighting. T. at 99. The lights were not installed until after the move in date of April 1, 2003 because they were not available.
 {¶ 16} Summers and her son moved into the house on April 1, 2003. T. at 102. The house was not complete. The lawn needed the final grading, seeding and landscaping. T. at 102. Goff also needed to install the special order light fixtures which had not arrived upon move in. T. at 105.
 {¶ 17} Summers withheld $26, 900. Summers paid Muskingum Sewer $2,650.00 to hook up the sewer. T. at 118. Summer also paid $ 3,800 to Belden Lighting, reducing the retained funds to $20,450. Goff does not contend these payments were inappropriate.
 {¶ 18} Sometime prior to July 11, 2003, Goff and an employee came to the house to correct the positioning of some light fixtures, which resulted in holes in the drywall. T. at 81. Goff told Summers she would send someone out the next day to repair the drywall. T. at 82. Summers stated she would not be home and ignored any attempts by Goff to fix the drywall. T. at 82.
 {¶ 19} On July 11, 2003, Summers' legal counsel wrote Goff a letter invoking the "master mechanic" clause of the contract which required Goff to employ someone skilled in home construction to complete the home to Summers' satisfaction. Summers *Page 5 
cited an unpaid bill to Zanesville Glass in the amount of $8,792.19, additional plumbing by A-I Heating Cooling in the amount of $534.89, and the installation of a brick patio, rather than a concrete patio which was poured. Summers acknowledges the contract does not make any reference to a brick patio in the contract but "she believes the brick patio is part of the contract." See, July 11, 2003 letter. Goff did not respond to this letter.
 {¶ 20} On August 15, 2003, Summers' legal counsel sent a second letter to Goff invoking the contract clause to employ her own master mechanic and termination of the contract. See, August 15, 2003 letter.
 {¶ 21} On August 21, 2003, Zanesville Glass placed a mechanic's lien on Summers' property in the amount of $8,792.19. T. at 119-120. Summers settled and paid $7,792.19 to have the lien removed on April 20, 2004.
 {¶ 22} In March 2004, Zanesville Glass filed a complaint against Goff for monies owed for several different construction projects, including the Summers' property. Goff answered and filed a third party complaint against Summers, for improperly withholding the balance due under the contract. Summers answered and counterclaimed against Goff for additional rent paid by Summers due to the delayed move-in date and additional costs to correct defects of workmanship by Goff. On December 14, 2004, Goff and Zanesville Glass resolved the dispute between those two parties.
 {¶ 23} On June 10, 2005, the case between Summers and Goff proceeded to a bench trial. On March 2, 2007, the trial court found in Goff's favor, and ordered that Summers pay $19,105.73 to Zanesville Fabricators for the cabinets.[1] On March 20, *Page 6 
2007, Goff filed a motion for pre-judgment interest and asked the trial court to assign the judgment to Goff since she had paid Zanesville Fabricators "in full" after the trial. The trial court confirmed this by entry and ordered payment of the judgment from Summers to Goff, not Zanesville Fabricators. The trial court also awarded Goff prejudgment interest.
 {¶ 24} Summers raises four Assignments of Error:
 {¶ 25} "I. THE DECISION AND JUDGMENT OF THE TRIAL COURT IS CONTRARY TO LAW AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 26} "II. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY ITS FAILURE TO FIND IN FAVOR OF SUMMERS ON HER DEFENSE THAT GOFF FAILED TO COMPLETE CONSTRUCTION OF THE HOUSE IN A WORKMANLIKE MANNER."
 {¶ 27} "III. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN AWARDING STATUTORY PREJUDGMENT INTEREST UNDER REVISED CODE 1343.03 TO THIRD PARTY PLAINTIFF-APPELLEE GOFF."
 {¶ 28} "IV. THE DECISION AND JUDGMENT OF THE TRIAL COURT DENYING THE COUNTERCLAIM OF THIRD PARTY DEFENDANT-APPELLANT SUMMERS IS CONTRARY TO LAW."
 I, ll lV {¶ 29} We will address the first, second and fourth assignments of error because they are interrelated.
 {¶ 30} Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being *Page 7 
against the manifest weight of the evidence. C.E. Morris Co. v. FoleyConstruction Co. (1978), 54 Ohio St.2d 279, syllabus.
 {¶ 31} "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment." Estate of Barbieri v.Evans (1998), 127 Ohio App.3d 207, 211. Also, because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, syllabus 1.
 {¶ 32} Summers claims the decision of the trial court is contrary to law and against the weight of the evidence. We agree in part, and disagree in part for the following reasons.
 {¶ 33} A contract is created "where there is an offer by one side, acceptance on the part of the other, and a meeting of the minds as to the essential terms of the agreement." McCarthy, Lebit, Crystal HaimanCo., L.P.A. v. First Union Mgt., Inc. (1993), 87 Ohio App.3d 613, 620,622 N.E.2d 1093. Later acts and agreements may modify the terms of a contract; unless otherwise specified, neither consideration nor a writing is necessary. Smaldino v. Larsick (1993), 90 Ohio App.3d 691,698, 630 N.E.2d 408; Software Clearing House, Inc. v. Intrak, Inc.
(1990), 66 Ohio App.3d 163, 172, 583 N.E.2d 1056. Where one party assents to any modification or change in the terms of the contract, the assent, either express or implied, if acted on by the other party, would be binding upon the first party. See O.F. Mehurin Son v. Stone (1881),37 Ohio St. 49, 57-58. *Page 8 
 {¶ 34} First, we must address the nature of the contract. The contract between the parties was to build a home. Summers relies upon the "time is of the essence" clause in the contract. However, Summers dramatically altered the contract and time schedule by changing lots and the house plan. In Expanded Metal Fire Proofing v. Noel Constr. Co. (1913),87 Ohio St. 428, 440, the court stated:
 {¶ 35} "It is familiar law that stipulations in written contracts may be waived by the parties, and that a construction placed by the parties upon a written contract in the progress of its performance, with full knowledge of all the circumstances, will be binding. The rule is peculiarly just when applied to building contracts, when changes are made, the necessity for which develops as the work progresses and while the parties are intent on the accomplishment of the undertaking, no fraud or undue advantage being shown. (citations omitted)." See, also,Frantz v. Van Guten (1987), 36 Ohio App.3d 96, 99; 18 Ohio Jurisprudence 3d (1980) 110, Contracts, Section 205. Because such waivers usually operate in favor of one of the contracting parties, proof of waiver must be either in writing or by clear and convincing evidence. Ashley v.Henahan (1897), 56 Ohio St. 559, paragraph five of the syllabus.
 {¶ 36} Goff assented to the change in terms by moving forward with the new house plans and seeking approval by the developer of the Blackwood subdivision. Goff stated that these changes put them behind schedule. T. at 75. Further, Goff testified that it was impossible to complete the house by January 31, 2003 with the change of lot and house plans. T. at 89. Goff had to submit the plans to the developer for approval and this delayed building further. T. at 95. Goff indicated that Summers was aware that the construction scheduled might be altered. T. 103. We find that the evidence clearly *Page 9 
and convincingly establishes a waiver of the "time is of the essence" clause due to the change in design plans. See, Sandler v. AIIAcquisition Corp, Inc. (C.A. 6 1992), 954, F.2d 382, citations omitted (waiver may be expressed in words or conduct which makes a party's performance impossible, or which dispenses with complete performance at a time when the obligor may fully perform).
 {¶ 37} Summers also disputes several amounts owing to Goff. We will first address the bill from Zanesville Fabricators. There was an outstanding bill for $19,105.72. T. at 54. The bill prior to finance charges was $12,220.99. T. at 59. Goff customarily paid Zanesville Fabricators as the supplier. T. at 59. Goff testified that this matter was different because there was still some dispute about the cabinets. T. at 100. This dispute was due to Summers' indecision about the cabinets and Mr. Nash's sworn testimony that Summers picked out the disputed cabinets. T. at 57.
 {¶ 38} Essentially, the total amount of $ $19,105.72 owing to Zanesville Fabricators was undisputed. However, Summers correctly claims she is entitled to set-off from any amounts owing to Goff due to Summers' payment of the mechanics' lien to Zanesville Glass in the amount of $7,792.19. Goff conceded this amount at trial as well as $400.00 for shrubbery that was not planted. T. at 84. See also, Plaintiffs' Proposed Findings of Fact Nos. 25 and 26. Yet the trial court did not deduct these amounts from Goff's award. We find this was in error. Accordingly, we remand this matter to the trial court to deduct these amounts from its judgment in favor of Goff.
 {¶ 39} Summers next contends that Goff failed to complete the house in a workmanlike manner, including a leaking basement and the wrong cabinets. She also *Page 10 
sought expenditures to independent contractors for a host of issues, including plumbing, light fixtures and landscaping.
 {¶ 40} The duty to perform in a workmanlike manner is imposed by common law upon builders and contractors. Mitchem v. Johnson (1966),7 Ohio St.2d 66, 36 O.O.2d 52, 218 N.E.2d 594; Velotta v. Leo PetronzioLandscaping, Inc. (1982), 69 Ohio St.2d 376, 23 O.O.3d 346,433 N.E.2d 147. This has been reaffirmed by numerous cases. Barton v. Ellis (1986),34 Ohio App.3d 251, 518 N.E.2d 18; Velotta, supra; Mitchem, supra; Lloydv. William Fannin Bldrs. (1973), 40 Ohio App.2d 507, 69 O.O.2d 444,320 N.E.2d 738; Tibbs v. National Homes Constr. Corp. (1977),52 Ohio App.2d 281, 6 O.O.3d 300, 369 N.E.2d 1218; Sadler v. Bromberg (App. 1950), 62 Ohio Law Abs. 73, 75, 106 N.E.2d 306, 307.
 {¶ 41} It was apparent from the testimony at trial that Goff attempted to satisfy Summers' special requests and indecisiveness. This Court has already discussed Goff's willingness to alter the contract as to the lot and house plans. Further, Mr. Nash testified that Summers came into Zanesville Fabricators eight to twelve times to discuss cabinets and kept changing her mind. T. at 55-56. Goff believed the cabinets installed were not the ones Summers had initially picked out. T. at 77.
 {¶ 42} Further, Summers special ordered lighting which was not available until after her move in date. Goff installed it and Summers decided she did not like it, so Goff removed the lighting and is now storing it in her storage building. T. at 81. After the removal, Goff attempted to replace the lights and repair the drywall but Summers rebuffed all attempts. T. at 82-83. *Page 11 
 {¶ 43} Lastly, Summers and her son testified about a leaking basement first occurring in August, 2003, but Goff was not even aware there was a problem. T. at 83. Goff testified that had she been aware there was a problem, it would have been fixed. Id. At trial, Wayne Alvey who excavated and poured the basement walls, testified he finished grading the yard after Summers moved in, sloped it away from the house and backfilled the backyard to a lower level to allow water to drain away from the house. T. at 44, 49-50. Summers conceded that on August 19th, Alvey called and wanted to check the sump pump but she never called him back even though she said she would. T. at 23. Summers presented the testimony of John Britton, as an expert in grading, that the yard was not graded properly, due to a "ridge" in the front of the house and the presence of a sinkhole. T. at 176. Goff contends that Britton viewed the property after Summers had hauled in two tons of dirt and re-sloped the grade around her house. T. at 28, 171.
 {¶ 44} Upon review, we find there was competent, credible evidence to support a determination that Goff performed in a workmanlike manner.
 {¶ 45} Summers further asserts that the trial committed error in denying her counterclaim for rent because she could not move into the house until April 1, 2003. Because we have found that the time is of the essence clause was waived by Summers, she is not entitled to recover for additional rent resulting from the delay in construction.
 {¶ 46} Summers' first assignment of error is sustained; and the second and fourth assignments of error are overruled. *Page 12 
 III {¶ 47} In her third assignment of error, Summers argues the trial court erred in awarding Goff prejudgment interest.
 {¶ 48} The trial court awarded prejudgment interest pursuant to R.C.1343.03(A). R.C. 1343.03 provides a creditor is entitled to interest at the rate per annum determined pursuant to R.C. 5703.47, unless a written contract provides for a different rate of interest. The Supreme Court has held the award of pre-judgment interest in a breach of contract case is not discretionary, see, e.g., Royal Electric Construction Corporationv. Ohio State University, 73 Ohio St.3d 110, 1995-Ohio-131. The only question for the trial court is to determine when the claim became due and payable, on which date the interest begins to run, Commsteel,Inc. v. Bender Construction, Inc. (December 3, 1998), Cuyahoga App. No. 74189, citations deleted.
 {¶ 49} Although a trial court is required to award pre-judgment interest on a contract claim, the Supreme Court has held a party can waive pre-judgment interest if it does not make a request, Worrell v.Multipress, Inc. (1989), 45 Ohio St.3d 241.
 {¶ 50} Goff filed a motion for prejudgment interest and the trial court awarded interest from the time the claim became due and payable (April 1, 2003), the date Summers' moved into the house.
 {¶ 51} Summers' third assignment of error is overruled. *Page 13 
 {¶ 52} For the foregoing reasons, appellant's first assignment of error is sustained and appellant's second, third, and fourth are overruled. The trial court's judgment is reversed and we remanded this matter for further proceedings consistent with this opinion.
 Delaney, J. Gwin, P.J. and Hoffman, J. concur. *Page 14 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Muskingum County Court of Common Pleas is affirmed, in part, and reversed, in part. Case remanded. Costs assessed equally to appellant and appellee.
[1] There is a one cent discrepancy between the trial testimony and final judgment amount. *Page 1