[Cite as *Crockett Homes, Inc. v. Tracy*, 2024-Ohio-1464.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
CARROLL COUNTY

CROCKETT HOMES, INC.,

Plaintiff-Appellee/
Cross Appellant,

v.

THEODORE TRACY et al.,

Defendants-Appellants/
Cross-Appellees.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 23 CA 0966**

---

Civil Appeal from the
Court of Common Pleas of Carroll County, Ohio
Case No. 2021 CVE 29781

**BEFORE:**
Carol Ann Robb, Mark A. Hanni, Judges and
William A. Klatt, Retired Judge of the Tenth District Court of Appeals,
Sitting by Assignment.

---

**JUDGMENT:**
Vacated, Affirmed in part, Reversed in Part and Remanded.

---

*Atty. Todd A. Mazzola, Atty. Kristopher Immel*, Roderick Linton Belfance, LLP, for Plaintiff-Appellee/Cross-Appellant and

*Atty. Matthew W. Onest, Atty. John P. Maxwell*, Krugliak, Wilkins, Griffiths & Dougherty Co., L.P.A, for Defendents-Appellants/Cross-Appellees and

*Atty. Steven D. Barnett*, Carroll County Prosecutor, *Atty. Michael J. Roth,* Chief Assistant Prosecutor, Office of the Prosecuting Attorney, for Appellee Carroll County Treasurer and

*Atty. Jason N. Bing, Atty. Michael S. Gruber,* Gruber, Haren, Thomas & Co. for Appellee Consumers National Bank.

Dated:  April 17, 2024

---

**Robb, P.J.**

{¶1}    Appellants/Cross-Appellees, Theodore (Ted) Tracy and Julie Howell (collectively the Tracys), appeal three judgments issued by the Carroll County Court of Common Pleas granting summary judgment in favor of Crockett Homes, Inc. (Crockett) and Consumers National Bank (Consumers).  The Tracys contend the trial court erred by awarding summary judgment against them and in favor of Crockett and Consumers.

{¶2}    Regarding Crockett's claims, the Tracys assert numerous issues of fact remain for the trier of fact, including whether Crockett abandoned the parties' contract before the Tracys changed the locks on the home.  The Tracys also contend the court erred by finding Ted breached the home construction contract and that it erred by concluding Crockett's conversion and unjust enrichment claims had merit.

{¶3}    As for Consumers' claims, the Tracys assert genuine issues of fact exist regarding whether Ted breached the terms of the loan documents.  Ted claims he had a legal excuse for failing to ensure the home was timely constructed and for failing to keep the property free of liens.  The Tracys contend that Crockett's failure to submit the lien waiver justified Ted's failure to satisfy these contractual obligations.  Additionally, the Tracys claim Ted's refusal to sign Consumers' hold harmless agreement was of no consequence since he had already signed the necessary loan modification documents.

{¶4}    Appellee/Cross-Appellant, Crockett, cross-appeals and contends the court erred in calculating its damages award based on Ted's breach of contract.  Crockett claims the trial court erred in limiting it to restitution when it was entitled to recover its expectation damages or lost profits for breach.  In addition, Crockett contends the court erred in its reliance on the Tracys' K9 report to reduce the damages award when the

Case No. 23 CA 0966

report was not proper summary judgment evidence. Crockett claims this issue was not waived because it was not on notice that the court would rely on the report in this context.

{¶5}   For the following reasons, we conclude the trial court erred by granting summary judgment in favor of Crockett and against the Tracys regarding the construction contract. Thus, we reverse the trial court's decision granting summary judgment in favor of Crockett and dismissing the Tracys' affirmative claims against Crockett. We remand the matter for further proceedings.

{¶6}   However, we affirm the trial court's decision awarding summary judgment to Consumers, in part. We also affirm the court's decision concluding the bank was entitled to summary judgment on the Tracys' cross-claims against it.

Statement of the Facts and Case

{¶7}   In May of 2021, Crockett Homes Inc. filed suit against Theodore Tracy, Julie A. Howell (Julie), Consumers National Bank, the Carroll County Treasurer, and others who had a potential interest in the property, arising from the construction of a new home in Magnolia, Ohio. Crockett's first cause of action alleged Ted breached the contract by failing to sign change orders, failing to approve progress payments for work performed, changing the locks on the home, and threatening to call the police if Crockett attempted to access the property. The written agreement is attached to the complaint as Exhibit A.

{¶8}   Crockett's second claim contends Ted was unjustly enriched in the amount of $73,388.08. Crockett's third claim for relief alleged Ted committed fraud by requesting change orders and then refusing to sign written change orders, attached as Exhibits B and C. Crockett claimed Ted fraudulently induced it to perform additional work on the property without intent to pay. Crockett claims $4,961.80 in damages as a result.

{¶9}   Crockett's fourth claim against Ted asserts a claim for conversion. Crockett alleges it had a Kohler Jacuzzi 60" tub delivered to the Tracy construction site for temporary storage. Crockett claims it never obtained the tub, which was valued at $1,625.

{¶10} Crockett's fifth and final count sought a declaration that its mechanic's lien against the property was valid and foreclose on property.

{¶11} The Tracys filed an answer and counterclaim against Crockett and denied the allegations. The Tracys asserted five claims against Crockett. First, the Tracys claimed Crockett breached the parties' agreement by failing to complete the agreed upon

construction. Second, they asserted a slander of title claim based on Crockett's filing of a mechanic's lien against their property, which was allegedly false. Third, the Tracys asserted a claim to quiet title or seeking declaratory judgment that the mechanic's lien is false and invalid. Fourth, they claimed Crockett committed fraud by filing the lien and they were damaged as a result. The Tracys' final claim asserts Crockett violated Ohio Consumer's Sales Practices Act by failing to fully and properly perform in accordance with the parties' agreement and by its filing of the false mechanic's lien. (June 24, 2021 Answer and Counterclaim.)

**{¶12}** The Tracys also filed a cross-claim against Consumers National Bank. They alleged negligent misrepresentation in count one. They claimed after Crockett failed to finish the construction of their home, Consumers refused to release funds to pay for subsequent contractors' work. The Tracys claim to have justifiably relied on Consumers' assurances that it would disburse the funds when they hired additional contractors. The Tracys' second claim asserts they are entitled to indemnification and/or contribution from Consumers from any judgment or liability they have to Crockett. (June 24, 2021 Cross-Claim.)

The Home Construction Contract

**{¶13}** The Crockett Homes construction contract states on page one that it is an agreement between the contractor and buyer, Theodore J. Tracy. It is for the construction of a new home located in Rose Township, Magnolia, Ohio. The contract consists of 48 specifications. The first 47 are standard form specifications, which are listed on page one. Number two states in part:

> EXTRAS OR CREDITS: Any deviations from these specifications, Warranty, or Blueprints involving an extra charge or credit must be agreed upon in writing between the contracting parties *before the change is made.* If credit is made, the credit will be paid out of the final bank draw or reconciliation, whichever is applicable. If an extra charge is made a Change Order will be written and paid upon signature, *or change will not be made.* There will be a limit of no more than three changes and credits with an administration fee of $100 plus the change.

(Emphasis added.) Item 3 outlines the contractual allowances and states:

Case No. 23 CA 0966

ALLOWANCES: When the term allowance is mentioned within this Contract or exact cost is mentioned within this Contract, and then any cost or amount of monies to exceed the allowance or exact cost shall be paid by the Buyer and is due upon receipt. (Allowances are estimations of the cost, not exact costs and prices can vary depending on circumstances.)

{¶14} Page two of the contract lists the standard construction features. Specification number 48 is on page three. It consists of additions and deletions to the standard contract features and includes a list of additions and deletions with corresponding price increases and reductions for 31 items labeled A through EE.

{¶15} The total contracted price is listed as $329,151, and on page three it refers to the Buyer as Theodore J. Tracy and Julie Howell. Regarding payment, the contract states in part:

The Buyer agrees to pay the Contractor in current funds for the performance of the contract. * * * To any additions or deductions to the general conditions of the Contract that is agreed upon in writing, and to make payments on account as follows: 12.5% Initiating Draw, 12.5% Foundation Draw, 27.5% Framing Draw, 27.5% Drywall Draw, 12.5% Trim Draw, 7.5% Final Draw.

{¶16} Page three of the agreement also states in part: "Contractor retains complete and total control and possession of the property, as well as of sub-contractors, until all monies are paid in full. Buyers shall have one walk thru [sic] with one punch-out list and after all monies are paid in full to the Contractor, the Contractor will return Control of the Property to the Buyer."

{¶17} Page four of the agreement has three signature lines. It is signed by David Hayes and Theodore J. Tracy. Both signatures are dated November 18, 2019. (Complaint Ex. A.)

{¶18} There was an Addendum to the Crockett-Ted Tracy construction agreement. Crockett attached a copy of the Addendum to its complaint. It states in part that it is separate from the parties' original contract and the items listed are to be paid independently from the original contract, but the listed items will be "included under and/or added to the Buyer's construction loan * * *." The Addendum also states payments for the septic and well installation shall be paid directly to the subcontractor, and payment for

Case No. 23 CA 0966

the driveway to Crockett will be released as "an additional draw * * * upon completion of the work." The Addendum totaled $13,500 additional work for Crockett, which is excluding the $21,500 for the gas, septic, and sewer installations and tie-ins. (Complaint Ex. A Addendum.)

{¶19} Consumers then filed an answer to the cross-claim and a counterclaim against Ted Tracy for breach of the loan documents and indemnity. (July 27, 2021 Consumers' Answer to Cross-Claim and Counterclaim.)

The Loan Documents

{¶20} The agreements between Consumers and Ted include a note, construction loan agreement, loan addendum, and an open-ended mortgage.

{¶21} The Note signed by Ted consists of three pages and states in part that he was borrowing and promising to repay $350,000 from Consumers National Bank. (February 12, 2020 Note.)

{¶22} The Construction Loan Agreement also dated February 12, 2020 is signed by Theodore Tracy and by Daniel Eshler for Consumers. The Construction Loan Agreement states under 2. My Agreements, in part:

> 2.1.3. Change Orders. Any material change in the Contract Price or Work or the Work and Payment Schedule must be in a written agreement signed by me and Contractor and approved by Lender * * * .
>
> * * *
>
> 2.1.5. Completing the Work. * * * I will use my best efforts to ensure the Contractor continues the Work diligently and in a commercially reasonable and workmanlike manner * * *.
>
> * * *
>
> I acknowledge that the Construction Contract represents that the Work will be completed on or before February 12, 2021 * * * but no later than twelve (12) months after the loan closing. * * *

The Construction Loan Agreement states under 3. Default and Remedies:

> 3.1. Events of Default. I will be in default * * * if any of the following events * * * occurs:
>
> 3.1.1. Nonpayment. * * *

3.1.2.  Other Broken Promises.  I fail to keep any promise in this Loan Agreement or any other Loan Documents.

3.1.3.  False Statements.  * * *

3.2.  Lender's Rights and Responsibilities.  Subject to my right to notice of default and right to cure the default(s), * * * if an Event of Default occurs, Lender has the following rights and remedies * * *:

* * *

3.2.4.  Indemnity.  I will indemnify and hold Lender and Lender's affiliates, * * * harmless from any liability, claim, loss, cost, legal expenses * * *, incurred by or alleged against any of the Indemnified Parties arising from * * * the Property * * *, the Work, or * * * my default * * *.

3.2.5.  Lender's Fees, Costs, and Expenses.  I will pay to Lender all attorney's fees, costs, and other expenses paid or incurred by Lender in enforcing or exercising Lender's Rights and Remedies under this Loan Agreement.  Interest will accrue on these amounts at the Note rate from the date the expense is disbursed * * *.  The expense plus interest will become additional debt secured by the Security Instrument.

3.2.6.  Rights Cumulative.  * * * All of Lender's Rights and Remedies contained in this Loan Agreement are cumulative and are in addition to any other Rights and Remedies created in any other Loan Document or existing at law or equity.

Under Section 4. General, the Construction Loan Agreement states:

4.1  My Cooperation.  Lender may require that I sign other instruments or documents * * * that it considers necessary to accomplish the purpose of this Loan Agreement.  I will sign such documents * * * at my own cost and expense.

{¶23}  The Construction Loan Addendum is also dated February 12, 2020 and signed by Ted.  It sets forth the repayment schedule and also states in part:

NOTICE OF NO ORAL AGREEMENT.  THE NOTE, THIS ADDENDUM, THE CONSTRUCTION LOAN AGREEMENT, AND THE SECURITY INSTRUMENT, AS AMENDED, REPRESENT THE FINAL AGREEMENT

BETWEEN THE PARTIES AND TO THE EXTENT PERMITTED BY LAW, MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENT OF THE PARTIES. THERE ARE NO ORAL AGREEMENTS BETWEEN THE PARTIES.

**{¶24}** The parties' Open-End Mortgage is dated February 12, 2020 and is signed by Ted and Julie. It states in part under Uniform Covenants:

4. Charges; Liens.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings * * *. If Lender determines that any portion of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days * * *, Borrower shall satisfy the lien or take one or more of the actions set forth above in Section 4.

**{¶25}** The parties' Open-End Mortgage also states in part under "9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument" if Borrower fails to perform his or her covenants and if there are legal proceedings that may affect the Lender's interest in the Property or rights under this Security Interest: "Lender's actions can include, but are not limited to: * * * appearing in court and * * * paying reasonable attorney's fees to protect its interest in the Property and/or rights under this Security Interest."

**{¶26}** The Construction Loan Rider to Security Interest states, under Amended and Additional Covenants, in part under the Construction Loan Agreement section: "Upon the failure of Borrower to keep and perform all the covenants, conditions and agreements of the Loan Agreement, the Principal and all interest and other charges provided for in the Loan Document and secured hereby will, at the option of the Lender, become immediately due and payable in full."

**{¶27}**  The Construction Loan Rider to Security Interest also states in part: Breach by Borrower.  In case of breach by Borrower of the covenants and conditions of the Loan Agreement, subject to any right of Borrower to cure Borrower's default, Lender * * * may invoke any of the rights or remedies provided in the Loan Agreement; (b) may accelerate the sums secured by this Security Instrument and invoke any of the remedies provided in the security Instrument, or (c) may do both.

* * *

Borrower will, upon demand, pay to Lender the amount of any and all expenses, including the fees and disbursements of Lender's legal counsel and of any experts and agents, which Lender may incur in connection with: (i) the making and/or administration of this Security Instrument; (ii) the custody, preservation, operation of, or the sale of, collection from, or other realization upon any Property * * * described in this Security Instrument; (iii) the exercise or enforcement of any of the rights of Lender under this Security Instrument; or (iv) the failure by borrower to perform or observe any of the provisions or covenants in this Security Instrument.

**{¶28}**  The parties' Loan Modification states the construction completion date was extended from February 2021 to June 1, 2021.  The copy attached to the bank's summary judgment motion is not signed but indicates it was approved by the Executive Vice President of the bank.  The parties tend to agree it was not signed.

**{¶29}**  Following the exchange of discovery and depositions, the parties filed competing summary judgment motions.

**{¶30}**  Crockett's summary judgment motion claimed they were entitled to judgment as a matter of law on each of their claims.  Their motion mirrors their claims in their complaint and seeks summary judgment on their breach of contract claim, unjust enrichment claim, fraud claim regarding change orders, conversion claim regarding the jacuzzi tub, and foreclosure on its mechanic's lien.  (February 22, 2022 Motion.)

**{¶31}**  Consumers filed its motion for summary judgment on May 9, 2022.  It claimed it was entitled to judgment as a matter of law on the Tracys' cross-claim against it for negligence, misrepresentation, and indemnification.   Consumers also sought

judgment in its favor on its counterclaims against Ted for foreclosure based on the breach of contract. It sought indemnification and attorney's fees pursuant to the loan documents. The bank alleged Ted breached his agreement four ways. They claim he failed to provide Consumers with necessary lien waivers to maintain Consumers' priority status; failed to keep the property free of liens; failed to ensure the construction was complete by the February deadline; and refused to sign the release, indemnification and hold harmless agreement. (May 9, 2022 Consumers' Motion for Summary Judgment.)

**{¶32}** The bank also claimed the Tracys' claims against it were barred by the economic loss rule. It also claimed the Tracys failed to plead their misrepresentation claim with sufficient certainty and that they were unable to prove their misrepresentation and negligence claims. (May 9, 2022 Consumers' Motion for Summary Judgment.)

**{¶33}** The Tracys' June 6, 2022 Memorandum Contra to Crockett's summary judgment motion asserted in part that Crockett sought payment or the draw corresponding with 80% completion of the home when only 69% was complete. Thus, the request for payment was incorrect. Tracys cite to the deposition of David Hayes in support. Tracys likewise claim when the "trim draw" was requested, Crockett again requested more money than work completed. They claim that Crockett continually sought payment for work that was not yet complete during the construction. (Shimek Depo. 110.) The Tracys claimed genuine issues of fact prevented summary judgment against them; they did not seek summary judgment in their favor.

**{¶34}** Regarding the two change order claims, the Tracys contend the contract required change orders to be executed *before* the changes were made to the home. The Tracys refer to the testimony of Julie Howell to establish disagreements between the Tracys and Crockett as to what should have been incorporated in a change order. For example, Julie testified the jacuzzi tub was not an upgrade, and as such, did not require a change order. She claims they did not sign the change orders presented by Crockett because they were either inaccurate or not agreed upon. (Howell Depo. 13.)

**{¶35}** Regarding the other jacuzzi tub, the Tracys deny knowing it was for another job, but understood it was to be returned to the manufacturer. They further claimed it is still on the property, and Crockett never asked for it to be returned. (Tracy Depo 73-74.)

{¶36} As for Crockett's ceasing work on the home and breach of contract claim for Tracys' alleged failure to approve the trim draw, the Tracys contend Hayes stated on behalf of Crockett that he was going to stop working until he was paid. At this point, the Tracys also claim Crockett canceled a door on December 30, 2020 that had been ordered for them. That same date, the Tracys claim Crockett came to the residence and retrieved their tools and materials. (Affidavit of Ted Tracy ¶ 28.) As a result, Ted Tracy sent an email to Crockett on January 2, 2021 advising Crockett it had breached the contract. Tracy also instructed Crockett to stay off the property. (Affidavit of Ted Tracy, Ex. C.)

{¶37} In addition to Crockett's failure to complete the contracted work, the Tracys claim some of the work completed was deficient or not completed in accordance with the contract terms. Thus, the Tracys contend they will have to spend in excess of $35,000 to remedy the issues. Furthermore, Tracy testified he has already spent $46,801.24 to complete work on the home that was supposed to be performed by Crockett pursuant to the contract. (Affidavit of Ted Tracy ¶ 31, 33.)

{¶38} The Tracys also claim Ted did execute a partial trim draw request, but Crockett failed to complete the corresponding paperwork necessary for this payment. However, the payment amount the Tracys authorized did not match the requested amount. (Affidavit of Daniel Eshler.) The Tracys contend they authorized the trim draw, otherwise the bank would not have sent an appraiser to the site to ascertain whether the work had been performed. (Affidavit of Daniel Eshler.) On approximately December 21, 2020, they claim Crockett ceased contract work. Thereafter, on December 30, 2020, Ted informed Consumers he no longer authorized the partial trim draw payment. (Affidavit of Daniel Eshler.)

{¶39} In opposing Crockett's unjust enrichment claim, the Tracys assert the report by K9 showed only 80% of the contract had been finished, and as such, Crockett had already received payment in excess of that amount. The Tracys claim the unjust enrichment claim also fails to account for several contract allowances, including a $10,800 wood burning fireplace.

{¶40} The Tracys also countered Crockett's fraud claim, arguing they did not misrepresent their intent to enter change orders. Instead, the Tracys claim the parties disagreed about what was to be covered by the change orders, as opposed to what was

incorporated under the original contract. And because the change orders were not executed, the Tracys claim Crockett should not have performed the work. Further, since the contract required change orders to be agreed upon and fully executed before the work was performed, the Tracys claim they are not obligated to pay.

{¶41} Regarding Crockett's foreclosure claim, the Tracys contend Crockett cannot establish a valid debt regarding the property. The Tracys assert the percentage of work completed did not correspond with the alleged work performed for the progress payment sought by Crockett. According to the Tracys, the bank appraisal reflected that the work completed was at 86%. However, the fourth draw was for 92.5% of the contracted work, and as such, Crockett was not yet entitled to the trim draw. (June 6, 2022 Memorandum Contra to Crockett's Summary Judgment Motion.)

{¶42} The affidavit of Theodore Tracy filed with the court on June 6, 2022 states in part that in November of 2020, the bank sought approval to pay Crockett money corresponding with completion of 92.5% of the contracted work. After the bank appraisal, Ted avers he authorized an additional contract payment of 6% to Crockett. Yet, in December of 2020, Ted claims Hayes advised them he would cease work if he was not paid the full amount of the trim draw. Thereafter, Ted averred Hayes removed his materials, workers, and tools from the jobsite. Ted has incurred $46,801.24 to complete the contracted work. He attached invoices and payment receipts as Exhibit D to his affidavit.

{¶43} Moreover, Ted asserted Crockett should have credited him with $15,196.25 in credits that were not accounted for in the contract price. He also asserts he incurred an additional $35,325 to repair work performed by Crockett. Ted also states he did not sign the change orders because they were incorrect, and he had a contractual allowance of $10,800 for a wood burning fireplace that was never installed.

Testimony

{¶44} Several depositions were taken and filed, including the depositions of Theodore (Ted) Tracy, Julie Howell, David Hayes, Katie Shimek, and Daniel Eshler.

{¶45} Daniel Eshler testified he has been the Consumers' Mortgage Division Manager for six years. He became involved in this project when the parties began having issues. The Crockett-Tracy relationship had not yet ended, but the parties were having

issues about timing and what work was being done. Eshler recalled the Tracys felt certain work was not done properly.

**{¶46}** Eshler also explained the draw process between the builder, buyer, and the bank, stating:

> The builder and the borrower sign off on the [draw request] form requesting the funds that were used to complete whatever step they're in, and basically the bank will receive that, order the update on the appraisal to check and make sure the work is done sufficiently and to check the title to make sure there's no additional liens on the property, and then usually seven to ten days [later,] they release the funds once * * * that work is all completed.

**{¶47}** Regarding the percentage of work being completed and the bank disbursing funds for certain draw requests, Eshler said there are some buyers and builders who "were ok with" releasing funds to "keep the project moving" when the percentage of work completed was "off a little." Eshler further explained that a mechanic's lien is problematic for the bank because it affects the bank's lien position or priority. (Daniel Eshler Depo. 27-38.)

**{¶48}** After the parties' contract ended, the bank tried to help facilitate the completion of the Tracys' home. According to Eshler, however, that did not work because Ted did not complete the required paperwork. Eshler recalled the "sticking point" for Ted was when the bank's attorney asked him to sign a hold harmless agreement. Eshler learned certain funds were not released to the Tracys' subsequent contractors because Ted did not return the necessary paperwork. (Daniel Eshler Depo. 10-22.)

**{¶49}** David Hayes was also deposed. Hayes is the sole owner of Crockett Homes, and Crockett owns Sippo Reserves, another company that completes Crockett's obligations under its home construction contracts. Hayes said Crockett is akin to the general contractor. Hayes' daughter, Katie Shimek, works for Sippo Reserves in marketing. (David Hayes Depo. 1-17.)

**{¶50}** Before Covid-19, a typical residential construction contract would take eight months to complete. Since the pandemic, Hayes said home construction was taking longer, closer to 18 months, usually because of shortages or delays on orders. For example, he said it now takes 11 months to get new garage doors. Hayes agreed that

Case No. 23 CA 0966

he told Ted that the construction of his home would take about eight months.  (Hayes Depo. 26-30.)

**{¶51}** Hayes also agreed change orders must be signed according to the written contract.  There were no signed change orders on the Tracy contract.  (Hayes Depo. 18.)  Hayes also agreed that if change orders are not signed, then the work should not be performed.  He explained Crockett does not provide the buyer an estimate of cost for a change order request; his company just creates the requisite change order per a buyer's request.  (Hayes Depo. 93-94.)

**{¶52}** As of December 30, 2020, Hayes said the Tracy home was about 98% complete and Crockett's lien reflects that amount.  Hayes said only "finish work" remained on the project.  Hayes denied knowing the procedure for securing payment or a draw from the bank.  He said his wife Lolly prepares the bank paperwork and liens.  (Hayes Depo. 63-67.)

**{¶53}** Hayes further agreed his company is only entitled to payment for work actually completed.  It would be inappropriate to issue a lien on 98% of the job completed when only 86% was finished.  (Hayes Depo. 83-86.)

**{¶54}** Regarding the second jacuzzi tub, Hayes explained how Julie decided she wanted a different tub than the one specified in the contract.  However, the original tub had already been delivered to the jobsite.  Hayes was unable to return it since it was a custom order.  He could have used it in another home.  One of his workers noticed the tub was missing from the garage about one week before the Tracys changed the locks.  Hayes never tried to remove the bathtub from the property.  (Hayes Depo. 92-94.)

**{¶55}** Regarding the issuance of draws or payments and percentage of work completed, Hayes said Crockett does not defer to what the bank says.  Crockett has its own documentation of items completed.  (Hayes Depo. 99.)  Regarding the third draw, Hayes agrees Crockett was paid for 54% of the job when only about 40% was completed.  (Hayes Depo. 102.)

**{¶56}** Hayes stated the Tracys breached the contract when they locked Crockett and its workers out of the home and by refusing to pay Crockett.  (Hayes Depo. 119.)  Hayes denies having evidence showing Tracy did not request the trim draw; Hayes only knows Crockett never received it.  (Hayes Depo.121.)

Case No. 23 CA 0966

**{¶57}** Hayes told Julie he was going to have to stop working on their home unless he got paid. He denies using email. Instead, any emails sent with his name on them would have been sent by his secretary Erin. (Hayes Depo. 122-128.)

**{¶58}** Hayes canceled a certain door ordered for the Tracy project on December 30, 2020. He canceled it because there was a breach of contract since the Tracys had not paid him. Further, he said the home already had a door, but not the door that Julie wanted. (Hayes Depo. 135.)

**{¶59}** Hayes' daughter Katie Shimek was deposed on March 7, 2022. Shimek has worked for Crockett for about nine years. She answers phones, assists with deals with clients, costs, and change orders. She is present for about 75% of client consultations and said her dad is present for all of them. (Shimek Depo. 24-27.)

**{¶60}** Regarding allowances, if a home construction contract had a certain allowance for lighting and the cost was less than that, Shimek said the buyer would get a credit in that amount. Generally, the punch-out list walk through is usually before the fifth and final draw or bank payment. The construction should be about 80% complete when the punch-out list is created before the walk through with the buyer occurs. (Shimek Depo. 45, 55-56.)

**{¶61}** Regarding the Tracys' build, Shimek contacted Crockett's lawyer, and he drafted the lien. Their attorney also determined the lien amount by calculating the amount still owed under the contract, the change order amounts, and the addendum work. Shimek also said Crockett had paid certain contractors directly instead of waiting on the bank draws. (Shimek Depo. 81.)

**{¶62}** Julie was not a party to the construction contract, but Crockett started interacting with her after the contract was signed and after she married Ted. This is when Shimek recalls difficulty began. According to her, it did not seem like Ted and Julie were "on the same page." Shimek said Julie would give them certain changes and then Ted would try to figure out where that change came from. At a certain point, Shimek was advised to only deal with Julie via email. Shimek said it seemed like Ted was "out of the loop." Then at another time, Crockett told Ted they would no longer deal with Julie. (Shimek Depo. 102-104.)

{¶63} Shimek said problems arose around the month of August because the Tracys were upset about the delays. The first five months or so went smoothly. Shimek also explained how Crockett had to redo certain work because of Julie's changes. (Shimek Depo. 115-117.)

{¶64} During the Tracys' build, the pandemic caused delays. There were material shortages, contractor shortages, and a quarantine. She also recalled only allowing one person to be present at a time at the site. (Shimek Depo. 49.)

{¶65} One of the change orders was regarding kitchen cabinetry. Julie picked out upgraded cabinets and approved the cabinet order, but then Ted did not sign the change order. The other change order was regarding the jacuzzi tub. According to Shimek, Julie decided she did not want the standard white bathtub after it was already installed. After the new one was installed, a Crockett subcontractor advised them that the white tub was gone. It was no longer in the garage where Crockett had stored it. Crockett planned to use it in another home. Thus, Crockett believed it was stolen. Shimek denies the Tracys asked Crockett to remove the tub from the garage. (Shimek Depo. 118-128.)

{¶66} Shimek said Julie and her dad "butted heads." Hayes told Shimek that Julie screamed and yelled at him, and thus, he was only going to communicate by email thereafter. Shimek also recalled subcontractors complaining about the Tracy job. At one point, Shimek lost her temper, and she swore at Julie. (Shimek Depo. 130-150.)

{¶67} Julie Howell, nka Julie Tracy, was deposed on April 8, 2022. Julie acknowledges seeking changes outlined in the first change order, i.e., master bathroom tub and shower units, master and half-bath toilets. She said the toilets were supposed to be gray, and they wanted the shower to be tiled instead of the unit. However, Howell said the tub should not be on the change order because it was already in the contract on page three. She agreed the first change order accurately reflected items she wanted, but she disagreed with the corresponding charges. She believed the tub price was already in the original contract. Also, the change order said "no charge" for the shower change, but then Crockett added a charge. Julie also said they never received the gray toilets. (Julie Howell Depo. 11-14.)

{¶68} The second change order was for the kitchen cabinets and certain credits. According to Julie, they purchased better fixtures than Crockett was installing in their

home. She and Ted expected Crockett to install the upgraded materials for them, but she said eventually they had to do certain things themselves.

{¶69} She and Ted decided to change the locks on the home when she went to the home and none of the promised work was being done. She said almost no work was done in the month of December of 2020, and on December 29, 2020, they changed the locks. They did not inform Crockett they were doing so. She denied knowing she would be locking out Crockett and its workers. Instead, she suggested that they should have called them to gain access. It does not surprise Julie that Crockett did not call to gain access because Hayes had already told her on the phone that he "pulled everybody off the job." (Howell Depo. 20-23.)

{¶70} Julie acknowledged emailing Crockett on January 2, 2021, stating in part that Crockett is no longer working for them and instructing them to stay off of the property. She denied that Crockett tried to come back to the property or contacted the Tracys in an effort to do so. When asked why they sent the email, Julie said: "Because they removed all of their property, they abandoned the project. They abandoned it on the phone and then they abandoned it when they came and removed everything that you would need to build a house." (Howell Depo. 24-25.) The only remaining item was the jacuzzi tub. She said it is still there but in the pole barn, not the garage. She said there is also a mantle or a threshold that Crockett left behind. (Howell Depo. 26-27.)

{¶71} The deposition of Theodore Tracy was taken on March 22, 2022 by counsel for Consumers. Regarding the Crockett construction, Ted believes there is a lot of work still not completed, including: "we still need interior doors, we still need our deck completed, we still need the closets up in the upstairs apartment to be completed, we still have to have a bathroom installed upstairs, we still have an auxiliary liquid propane tank that needs to be hooked up. There's a long list of things that I don't have." (Theodore Tracy Depo. 8.)

{¶72} He obtained a construction loan from Consumers for the house construction, which is now a mortgage. Regarding the loan terms, Ted stated in part: "We thought that the fact that one-year completion date with the loan contract would force our builder to complete it by then." The bank told them it would extend the time to perform in light of the construction delays. (Tracy Depo. 10-11.)

**{¶73}** When asked about his cause of action against the bank, Ted stated: "When we ended up taking control of the project to mitigate the damages to the property that was happening from not having heat, not having electricity in that property, and the drywall sucking up water from the area, [the bank] agreed to release funds for the rest of our loan for us to be able to finish the project. That failed to happen." (Tracy Depo. 12.) Ted said the payments "never happened" even though he submitted four sets of documents trying to get reimbursed and trying to get contractors paid. He said he ended up putting the additional contractors' payments on his credit cards. (Tracy Depo. 13.)

**{¶74}** Consumers' prior attorney wanted to help them, but then he left the position. Ted also claimed Consumers had incorrectly released funds to Crockett corresponding with 80% work performed when the bank's inspection report showed only about 69% of the work was complete. Thus, Ted said they were then in "a big hole to the point we were stuck with Crockett Homes, we had no alternative." (Tracy Depo. 14-15.) Consumers' representative Eshler advised the Tracys to "work with" Crockett.

**{¶75}** Ted also claimed Consumers released confidential information to Crockett about their intention to use "addendum funds" for a water feature when the construction slowed. He alleged Shimek told a bank employee they did not have enough money left in the contract. According to Ted, the "addendum funds" did not concern Crockett because they were "outside the contract." (Tracy Depo. 16-18.)

**{¶76}** He also alleged the bank's "draw system setup doesn't match up with Crockett Homes [draw or payment schedule] and they [the bank] just rubber-stamped it." Ted was also frustrated that Crockett was on the bank's approved builders list. Hayes encouraged him to use Consumers because he preferred their draw or payment system. (Tracy Depo. 19-20, 23-24.)

**{¶77}** Ted agreed they changed the locks on or about December 30, 2020. He said they were not ending their relationship with Crockett at that point but ensuring their property was secure. (Tracy Depo. 28.) Ted said Hayes told Julie he had "pulled everyone off the property until [he gets] paid." (Tracy Depo. 29.) They took their dumpster and portable toilet. "It gave us the impression they abandoned the jobsite." (Tracy Depo. 31.)

**{¶78}** Because it was a holiday weekend, Ted had concerns about who would be coming and going at the jobsite since the workers had access to the keypad. He was going to wait to see who called him to be let in, meaning Crockett and its subcontractors. (Tracy Depo. 29-30.) But soon thereafter, Crockett filed the mechanic's lien, which according to Ted, ended the relationship. Ted also said Crockett filed a false police report against them.

**{¶79}** Regarding the bank documents, Ted said he signed about four sets of documents. The bank extended the loan by about two or three months. He did not agree to sign a hold harmless agreement because it would make the Tracys responsible for the bank's attorney fees if it were sued by Crockett. Ted said it was presented to him after the loan modification was already completed. (Tracy Depo. 45-46.)

**{¶80}** Theodore Tracy's second deposition was taken April 8, 2022 by counsel for Crockett. During this deposition, Ted denied refusing to sign draw requests for the home construction. He said he signed every draw request "up to the last one." He believes he received the draw requests before the appraisals. (Tracy Depo. 16-17.)

**{¶81}** Ted denied knowing his contract with Crockett specified that Crockett was to have primary control over the property during construction. Ted also said Crockett's service was terrible and there were delays at all stages, even before building. He permitted his wife to make changes to the construction, but there were no signed change orders. Ted believed after he had the locks changed Crockett should have called him to access the property. (Tracy Depo. 21-24, 33-34, 45-46.)

**{¶82}** Regarding Exhibit 12, the final punch-out list, Ted said it was very incomplete. It did not include the remaining exterior work or the work required on the apartment above the garage. Ted informed Hayes about the incompleteness of the list during the walk through, but Hayes told him they would update the list another day. Hayes then canceled their next appointment. Ted asked multiple times to reschedule the walk through, but it never was reset. (Tracy Depo. 43-44.)

**{¶83}** Ted changed the locks with Crockett tools and materials inside. He felt the home and materials were not safe, and he lived approximately 45 minutes away at the time. (Tracy Depo. 48-49.) Crockett removed its equipment from the jobsite after he changed the locks. (Tracy Depo. 50.)

**{¶84}** Ted said Hayes told Julie on December 29, 2020 that he "pulled everybody off the job." (Tracy Depo. 65-66.) Ted recounted how Crockett promised them a quality custom built home, but everything was "builder grade," which was poor quality and would not last. He had numerous issues with the construction, including things that were incomplete and things that needed redone. (Tracy Depo. 75-76.) Ted said Crockett had terrible communication with them and did not pay several contractors.

**{¶85}** According to Eshler, the payment amount was conveyed to their commercial loan processer, who was told to disburse this amount to Crockett on December 28, 2020. Then on December 30, 2020, Eshler stated he was "told by Ted Tracy to no longer disburse the $19,689.00 to Crockett Homes or any other amounts that are not yet disbursed." Eshler further explained that in order for a draw or payment to be made, "a draw request needs to be presented and signed off by the home buyer and an appropriate lien release needs to be signed by the builder * * *." He also said "there had never been a draw request presented with the amount of the appropriate draw being $19,689.00 based upon percentage of completion." Neither Crockett nor Tracy prepared that draw request. "In every single prior draw request * * *, there was a draw request prepared by Crockett Homes and signed by Ted Tracy and with a subsequent lien release by Crockett Homes." Notwithstanding, he said the bank was prepared to release the funds. (September 6, 2022 Affidavit of Daniel Eshler.)

**{¶86}** Further, the bank's loan processer stated the necessary process was not followed by Crockett and Tracy for the $19,689.00 draw, and as such, the money was not disbursed. (September 6, 2022 Affidavit of Nicole Howell.)

Trial Court Decisions

**{¶87}** The trial court addressed the competing claims and summary judgment motions via three judgments.

**{¶88}** On January 11, 2023, the court issued its first of three judgments appealed granting summary judgment. The court first found Tracy "terminated" the contract by barring Crockett from coming onto the property. Elsewhere the court concluded the Tracys "breached" the parties' contract. It granted Crockett judgment as a matter of law on each of its claims, except fraud, and found the Tracys' claims lacked merit and entered

judgment against them.  The trial court found the following regarding Crockett's breach of contract claim:

3. The contract set forth a payment scheduled to Crockett of 12.5% as an initial draw, 12.5% foundation draw, 27.5% framing draw, 27.5% drywall draw, 12.5% trim draw, and a 7.5% final draw. This draw schedule was agreed to by both Crockett and Tracy to ensure that the project would continue moving forward.

4. Crockett performed under the contract and Tracy testified to the work that was completed and his approval of several draw requests. Prior to payment, the bank would send an appraiser out to verify the work associated with the payment was performed.

5. On July 1, 2020, Crockett submitted the trim draw request to Tracy for his signature. There is still some question of fact surrounding this draw request, and whether or not it  was finally signed by Tracy, and if so, when and for how much. However, the Court is not basing its ruling on this issue, as Tracy's performance concerning this issue becomes moot when Tracy himself terminates the contract and bars Crockett from coming onto the property.

6. On or about December 30, 2020, the Tracys informed Consumers that it was not to disburse any remaining funds to Crockett, including any previously approved draw requests.

7. It is undisputed that the full 12.5% trim draw was not released pursuant to Crockett's request.

8. On January 2, 2021, Tracy sent Crockett an email telling Crocket[sic] in part that "You no longer work for me. If you trespass at my property I will contact the Carroll County Sheriff."

9. Sometime around December 30th, 2020, Tracy changed the locks on the home, which prevented Crockett from performing any further work. Tracy also threatened to call the Sheriff, if Crockett came onto the property.

10. Tracy attempts to defend these actions by claiming that Crockett terminated the contract when Crockett informed Tracy that "until I get paid,

Case No. 23 CA 0966

I've got to stop working." Crockett then removed several construction items and tools from the property, on December 30th, 2020.

11. Crockett's action in refusing to perform more work until the draw schedule was honored, and removing construction items and tools from the property, do not amount to a termination of the contract, nor a breach of contract.

12. Article 4 of the Contract states "Contractor retains complete and total control and possession of the property, as well as of sub-contractors until all monies are paid in full." Tracy and his wife testified they changed the locks on the property solely at their discretion without informing Crockett.

13. Tracy breached the contract with his actions of unilaterally changing the locks, in violation of Article 4; Tracy's email informing Crockett they no longer work for him; and his threat to call the Sheriff, if Crockett trespassed on his property.

(January 11, 2023 Order for Summary Judgment.)

**{¶89}** The trial court also found Crockett's unjust enrichment claim had merit. The court stated Crockett was not paid for the outstanding draw request as well as the change orders. It does not analyze the validity of the change orders or the Tracys' contention that the work corresponding with the trim draw was incomplete. (January 11, 2023 Order for Summary Judgment.)

**{¶90}** The trial court denied Crockett summary judgment as to its fraud claim, noting questions of fact remain. As for Crockett's conversion claim, it found this claim was meritorious. It determined the evidence showed the Tracys' act of locking Crockett out of the property prevented it from retrieving the jacuzzi tub. Last, as for Crockett's foreclosure claim, the court found the lien was properly filed and valid. Thus, the court concluded Crockett was entitled to summary judgment as to all of its claims, except its fraud count. It found the lien valid and noted a decree of foreclosure shall issue.

**{¶91}** As for the Tracys' counterclaims against Crockett, the trial court summarily concluded: "Tracy and Howell did file a six-count counterclaim * * * against Crockett. Due to the nature of this Order and the claims themselves, the Court finds that all six counts

are without merit and are hereby dismissed." (January 11, 2023 Order for Summary Judgment.)

**{¶92}** The trial court rejected Tracys' claim that Crockett breached first by refusing to continue the work until it was paid the trim draw and its removal of tools and equipment from the property. The court concludes this does "not amount to a termination of the contract, nor a breach of contract." (January 11, 2023 Order for Summary Judgment.)

**{¶93}** Thereafter, Crockett filed a supplemental motion for summary judgment regarding its claimed damages. Crockett sought damages totaling $66,738.08, plus punitive damages and attorney's fees for fraud. Crockett alleged it sustained damages based on breach of the contract in the amount of $56,455.19; damages under the "Addendum" in the amount of $5,884.38; and damages for work performed pursuant to change orders totaling $2,548.51. (April 12, 2023 Supplemental Summary Judgment Motion.)

**{¶94}** The Tracys opposed and claimed that regardless of the trial court's existing judgment against them, Crockett was not entitled to any corresponding damages. They also challenged the bank's damage claims. (April 12, 2023 Tracy Opposition.)

**{¶95}** In support, they offered another affidavit by Theodore Tracy, which is fifteen pages plus exhibits. It details and disputes Crockett's alleged damages. (April 11, 2023 Affidavit of Theodore Tracy.)

**{¶96}** On May 3, 2023, the trial court issued the other two judgments appealed. It granted summary judgment in favor of Consumers in one. In this judgment, the court found that Ted had executed a note in the amount of $350,000 and construction loan agreement, construction loan addendum, and construction loan rider with Consumers in February of 2020. The note was secured by an open-end mortgage signed by Ted and Julie.

**{¶97}** Crockett recorded its mechanic's lien against the Magnolia Road property on January 8, 2021 in the amount of $65,238.08.

**{¶98}** The court found Consumers permitted Tracy to cure certain defaults by entering loan modifications, which included extending the construction completion date and protecting the bank's security interest in the property. Consumers also requested

Case No. 23 CA 0966

Ted to sign a release, indemnification, and hold-harmless agreement, which he refused to sign.

**{¶99}** The court found Ted "failed to comply with the Loan Documents" by failing to provide the requested lien waivers to maintain the priority of the bank's security interest; by incurring a mechanic's lien on the property; by failing to complete construction of the home by February of 2021; failing to keep the property free of liens and failing to promptly discharge liens; failing to properly execute lien waivers; failing to use "best efforts" to ensure that Crockett continued the contract work; by directing Crockett to make contract changes without the bank's approval; and by failing to execute the bank's release, indemnification, and hold harmless agreement which prevented Consumers from releasing the remaining Tracy funds.

**{¶100}** In light of the breach, the court found Consumers was entitled to judgment on its foreclosure claim and judgment on the unpaid balance, plus interest. The court further found the loan documents provided for Ted to indemnify the bank for attorney's fees, costs, and expenses incurred in litigation. The court was to set a hearing on the reasonableness of Consumers' attorney's fees, which has yet to occur.

**{¶101}** The trial court also found the Tracys' cross-claims against Consumers lacked merit since they were not "cognizable, valid or recoverable * * *." It found Ted was in breach of the loan documents; the loan documents precluded a claim against the bank; and the economic loss rule applied to the Tracys' cross-claim. The court also held the Tracys failed to plead their alleged misrepresentation claim with particularity; the Tracys failed to present evidence of any misrepresentations; and the Tracys had no right to be indemnified by Consumers.

**{¶102}** The second judgment issued May 3, 2023, was a damages order regarding Crockett's claims against the Tracys. The court awarded Crockett damages for breach of contract in the amount of $25,573.38, consisting of $19,689 for work performed and not paid and $5,884.38 for addendum expenditures. The trial court also held Crockett's fraud claim lacked merit. The court also awarded Crockett $2,548.51 for unjust enrichment regarding work it performed for the change order requests.

**{¶103}** The Tracys moved the court to stay the judgments against them pending appeal, which the trial court granted. They then filed a notice of appeal from the three

Case No. 23 CA 0966

trial court judgments.  Crockett filed a cross-appeal.  The trial court issued a nunc pro tunc order concerning its damages and fraud judgment expressly finding it was final and appealable and that no just reason for delay exists.  The parties filed amended notices of appeal.

{¶104}  The Tracys raise two assignments of error.  Crockett also raises two assigned errors.

<u>Breach of the Home Construction Contract</u>

**The Tracys' Assignments of Error**

{¶105}  The Tracys' first assignment contends:

"The trial court erred in granting summary judgment to the Appellee, Crockett Homes, Inc., on its breach of contract, unjust enrichment, conversion, and foreclosure claims and on Appellants' counterclaims."

{¶106}  Under subsection C in their brief, the Tracys raise five arguments regarding the court's breach of contract determination.  We collectively address their first four contentions.

{¶107}  First, the Tracys claim there is a genuine issue of material fact regarding what amount of work under the contract Crockett completed and whether it performed its contractual obligations.

{¶108}  The Tracys assert Crockett made inappropriate draw or payment requests when it had not completed enough work to secure the corresponding draw.  The Tracys claim Ted submitted a draw request in December of 2020 to Consumers.  However, Consumers sent an appraiser to the jobsite, who determined the bank could not issue the 12.5% draw because Crockett did not complete the corresponding work.  Thus, the Tracys claim Crockett is not entitled to any portion of the trim draw.  Additionally, they claim the trial court disregarded the plain language of the contract by awarding Crockett damages corresponding with a partial payment of the trim draw.

{¶109}  Second, the Tracys claim there is a genuine issue of material fact as to whether Crockett breached or abandoned the contract.  Despite not being entitled to payment for the trim draw, the Tracys claim Crockett abandoned the contract and its contractual obligations by its conduct.  They assert Crockett declared it was ceasing work on the construction until after it "got paid."  At this same time, the Tracys claim Crockett

canceled a door that had been ordered for them.  Thereafter, the Tracys contend Crockett returned to the jobsite and removed its tools, dumpster, and portable toilet.  They claim Crockett's conduct constituted an abandonment of the contract.  Alternatively, they claim it constitutes a breach of contract.

**{¶110}** The Tracys also assert there are issues regarding the credibility of Crockett's representatives such that summary judgment is inappropriate based on the inconsistent testimony by its representatives about the percentage of contract work completed.

**{¶111}** Fourth, the Tracys claim their conduct of changing the locks was a reasonable response to Crockett's abandonment of the contract and not a breach. Because the contract had already been breached or abandoned by Crockett, the Tracys claim their decision to change the locks was of no consequence.

**{¶112}** We review awards of summary judgment de novo.  *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996).  Pursuant to Civil Rule 56(C), summary judgment is proper if:

> (1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.

*Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977).

**{¶113}** The party moving for summary judgment bears the initial burden of demonstrating the absence of genuine issues of material facts concerning the essential elements of the non-moving party's case.  *Dresher v. Burt*, 75 Ohio St.3d 280, 292, 662 N.E.2d 264 (1996).  The moving party must support the motion by pointing to some evidence in the record of the type listed in Civil Rule 56(C).  *Id.* at 292-293, 662 N.E.2d 264.  If the moving party satisfies its burden, the non-moving party has the reciprocal burden to demonstrate that a genuine issue of fact remains for trial. *Id.* at 293, 662 N.E.2d 264. The non-moving party may not rest on allegations or denials in her pleadings, but must point to or submit evidence of the type specified in Civil Rule 56(C). *Id.*; Civ.R. 56(E).

**{¶114}** Crockett opposed the Tracys' motion for summary judgment in part, contending they had offered no evidence to support their claims except self-serving affidavits. We disagree with this contention.

"[A] non-moving party may defeat a motion for summary judgment with his own affidavit if it is made on personal knowledge, sets forth facts as would be admissible in evidence, and shows affirmatively that the affiant is competent to testify to the matters stated in the affidavit" * * *; *Wolf v. Big Lots Stores, Inc.,* 10th Dist. No. 07AP-511, 2008-Ohio-1837, 2008 WL 1759073, ¶ 12 (Internal citation omitted) ("While a party's affidavit is perfectly competent evidence under Civ.R. 56(E), it must be made on personal knowledge, set forth facts admissible in evidence, and affirmatively demonstrate that the affiant is competent to testify on the matters set forth in the affidavit," nonetheless, "[a] party may not establish a material issue of fact in opposition to summary judgment by submitting a self-serving affidavit presenting nothing more than bare contradictions of other competent evidence and conclusory statements of law.").

*Kiser v. United Dairy Farmers*, 2023-Ohio-2136, 219 N.E.3d 465, ¶ 21 (10th Dist.).

**{¶115}** A party may be in the best position to offer testimony in support of her cause. *See Hood v. Diamond Products, Inc.*, 74 Ohio St.3d 298, 304, 658 N.E.2d 738 (1996). In *Hood*, a plaintiff claiming disability discrimination provided an affidavit describing her cancer diagnosis and its impact on her work. The lower courts disregarded her affidavit as self-serving and uncorroborated. The Supreme Court reversed and concluded "[s]uch testimony was clearly within the personal knowledge of appellant," satisfied the standards of Civ.R. 56, and did, in fact, create a genuine dispute of material fact as to whether she was "handicapped." *Id.* at 304, 658 N.E.2d 738.

**{¶116}** For a plaintiff to successfully prove a breach of contract, it must show "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff. * * * The damages awarded for a breach of contract should place the injured party in as good a position as he would have been but for the breach. * * *." *Bertovich v. St. John*, 8th Dist. Cuyahoga No. 96619, 2012-Ohio-475, ¶ 19-20.

{¶117} The Tracys' first contention is that an issue of fact exists as to whether Crockett performed its commitments under the contract corresponding with the trim draw, warranting Crockett to request the trim draw and advise them it would cease additional contract work until payment was received. We agree.

{¶118} As stated, Ted testified that in November of 2020, the bank sought approval to pay Crockett money corresponding with completion of 92.5% of the contracted work. This trim draw request triggered the bank's appraisal. Consumers sent an appraiser to the jobsite, who according to the Tracys, determined the bank could not issue the 12.5% draw because Crockett did not complete the corresponding work.

{¶119} The Tracys claim that in December of 2020, David Hayes stated he would cease work if he were not paid the full amount of the trim draw. Hayes told this to Julie, who relayed this to Ted.

{¶120} Regarding the percentage of work completed and the bank disbursing funds for certain draw requests, Eshler said there are some buyers and builders who "were ok with" releasing funds to "keep the project moving" when the percentage of work completed was "off a little."

{¶121} The Tracys claimed 86% of the contracted work was complete when Crockett sought payment for 92.5% and advised Julie he was stopping the contracted work until this progress payment was received. Despite not being entitled to payment for the trim draw, the Tracys claim Crockett unilaterally abandoned the contract and its contractual obligations by its conduct. They assert Crockett declared it was ceasing work on the construction until after it received the trim draw. The trial court did not address this argument.

{¶122} In response, Crockett denies abandoning the contract. Yet, Crockett acknowledges the evidence shows a dispute as to what payment was due and owed at this time. Hayes also denied refusing to continue to perform the contract work until it received payment. Further, Crockett also counters that its breach, if any, was not a material breach. It contends it substantially performed its contractual obligations, and as such, the Tracys were not excused from performing under the contract.

{¶123} Abandonment is "the intentional relinquishment of a known right." *Hodges v. Ettinger*, 127 Ohio St. 460, 463, 189 N.E. 113 (1934). Abandonment of a contract

Case No. 23 CA 0966

cannot be achieved unilaterally. A "contract will be treated as abandoned when the acts of one party, which are inconsistent with the existence of the contract, are acquiesced in by the other party." *Hunter v. BPS Guard Services, Inc.*, 100 Ohio App.3d 532, 541, 654 N.E.2d 405 (10th Dist.1995).

> "Where one party effectively abandons a contract, the other party may accede to the abandonment and, in effect, the contract is dissolved by the mutual assent of both parties. In such a case, the parties are restored to their original positions and neither party may sue for breach of the contract, nor compel specific performance." *Hunter* at 541, citing *Hodges* and *Bryant v. Richfield Properties* (Sept. 5, 1990), 9th Dist. No. 14533, 1990 WL 129237.

*Coburn v. Auto-Owners Ins. Co.*, 189 Ohio App.3d 322, 2010-Ohio-3327, 938 N.E.2d 400, ¶ 22 (10th Dist.).

**{¶124}** When Crockett communicated its plan to cease performance of its contractual duties until it received payment, there is no corresponding evidence showing Crockett also expressed an intent to end its contractual obligations with the Tracys. Although Hayes told Julie he was pulling his workers off the job, this statement was qualified by the fact that the work would stop "until" Crockett was paid. For this reason, there was no abandonment at this juncture.

**{¶125}** Crockett counters that regardless of the percentage of work complete, it was entitled to the trim draw progress payment because it had substantially performed its contractual duties.

> Where a party has substantially performed its contract obligations, the party is entitled to payment under a contract. * * * If there has been substantial compliance, the party has not breached the contract. * * * Application of the doctrine of substantial performance is to be confined to cases where the party has made an honest or good faith effort to perform the contract terms.

*Thompson v. Executive Transport Serv.*, 6th Dist. Erie No. E-03-018, 2004-Ohio-686, *3.

**{¶126}** "The doctrine of substantial compliance allows for minor deviations from contractual specifications; it does not, however, vouchsafe a contractor a license to install whatever is, in his judgment, 'just as good'" (Citations omitted.) *Warren Concrete & Supply, Inc. v. Strohmeyer Contracting, Inc.*, 11th Dist. Trumbull No. 2010-T-0004, 2010-

Ohio-5395, ¶ 23.  "For the doctrine of substantial performance to apply, the part unperformed must not destroy the value or purpose of the contract."  *Hansel v. Creative Concrete & Masonry Constr. Co.,* 148 Ohio App.3d 53, 56, 772 N.E.2d 138, 2002-Ohio-198.

{¶127}  The case relied on by Crockett, *Perkins v. Petrilli*, 7th Dist. Mahoning No. 21 MA 0089, 2022-Ohio-2029, and the cases discussed in *Perkins*, i.e., *Davis v. J & J Concrete*, 11th Dist. Trumbull No. 2018-T-0074, 2019-Ohio-1407, ¶ 15  and *Yashphalt Seal Coating, LLC v. Giura*, 7th Dist. Mahoning No. 18 MA 0107, 2019-Ohio-4231, ¶ 39, show the doctrine is inapplicable here.  Each case involved completed projects containing defects that did not satisfy contract specifications.  Notwithstanding the deviation, the court in each case found the completed project was capable of being used for its intended purpose despite the alleged defects.  None of the three cases involved a mid-construction dispute about whether a progress payment was due under the contract.  And none of the three cases involved a declaration by the builder that the contracted work would cease until a disputed progress payment was received.  *Id.*  Accordingly, the doctrine of substantial performance is inapplicable.

{¶128}  The Tracys also claim Crockett's demand for payment for incomplete work and refusal to continue the contract work until it received payment was not warranted under the agreement and constituted a breach.  Thus, the Tracys claim their subsequent act of changing the locks on the jobsite was not a breach since the contract had already been breached by Crockett.

{¶129}  As stated, the trial court concluded, without analysis, that Crockett's behavior in this regard was not a breach.  It did not, however, analyze whether Crockett was entitled to the trim draw at this time.  The trial court did not acknowledge the existence of competing facts on this issue.

{¶130}  Julie testified that she and Ted decided to change the locks on the home *after* Hayes told her he was pulling "everybody off the job." (Howell Depo. 20-23.)  Hayes agreed in his deposition that he told Julie he was going to stop working on their home until Crockett received the trim draw. (Hayes Depo. 122-128.)  Hayes also testified that Crockett does not defer to what the bank says regarding the percentage of the contract

completed for payments or draws. Instead, Crockett has its own documentation of contract items completed. (Hayes Depo. 99.)

**{¶131}** Notwithstanding, the contract is silent as to whose determination governs the percentage of work completed on the project such that the corresponding draw or payment is required. The contract states:

> The Buyer agrees to pay the Contractor in current funds for the performance
> of the contract. * * * To any additions or deductions to the general conditions
> of the Contract that is agreed upon in writing, and to make payments on
> account as follows: 12.5% Initiating Draw, 12.5% Foundation Draw, 27.5%
> Framing Draw, 27.5% Drywall Draw, 12.5% Trim Draw, 7.5% Final Draw.

**{¶132}** Further, Eshler explained in his affidavit that he was responsible for overseeing the disbursements for the Tracy-Crockett construction contract. Eshler stated in part:

> On November 30, 2020, a draw request was submitted in the amount of
> $41,143.87, which Ted Tracy indicated needed adjusted. * * *
> On December 12, 2020, an appraisal of the property confirmed an
> appropriate draw of $19,689.00, which equated to the build being eighty-six
> (86) percent complete. * * *

Thus, we agree that the evidence shows there is an issue of fact as to whether the job was 86% or 92% complete at this time.

**{¶133}** In response to Hayes' statement that he was stopping contract work, the Tracys changed the locks on the jobsite either later the same day or the next day. They changed the locks with Crockett's tools and materials inside. (Tracy Depo. 48-49.)

**{¶134}** Hayes also canceled a special order door that had been ordered for the Tracy project on December 30, 2020. He canceled it because there was a breach of contract since the Tracys had not paid him. (Hayes Depo. 135.) It is unclear whether the door was canceled before or after the locks were changed. The parties tend to agree, however, that Crockett removed its equipment from the jobsite *after* the Tracys changed the locks. (Tracy Depo. 50.)

**{¶135}** Whether one's breach of a contract is a material breach, also known as a total breach, is generally a question of fact. *O'Brien v. Ohio State Univ.*, 10th Dist. Franklin

No. 06AP-946, 2007-Ohio-4833, ¶ 11. "[T]o determine whether a party's breach was material requires, inter alia, an examination of the parties' injuries, whether and how much the injured parties would or could have been compensated, and whether the parties acted in good faith. *Id.* All of these inquiries turn on subjective facts." (Citations omitted.) *Id.*

> It is well-settled that "[a] 'material breach of contract' is a failure to do something that is *so fundamental* to a contract that the failure to perform defeats the essential purpose of the contract or makes it impossible for the other party to perform." (Emphasis added.) *Marion Family YMCA v. Hensel,* 178 Ohio App.3d 140, 2008-Ohio-4413, 897 N.E.2d 184, ¶ 7 (3d Dist.), citing Williston on Contracts, Chapter § 63:3.

*Price v. KNL Custom Homes, Inc.*, 2015-Ohio-436, 28 N.E.3d 640, ¶ 32 (9th Dist.). However, if the breach is relatively minor, the other party is still bound to the contract.

**{¶136}** We agree that a genuine issue of fact exists as to whether Crockett was entitled to payment for the trim draw and consequently, if its declaration that it was ceasing contract work until it was paid was justified. The trier of fact should determine whether Crockett was in breach of the terms of the agreement. If it finds Crockett had not completed the work warranting the payment demanded, the factfinder must determine whether this conduct constituted a material breach.

**{¶137}** If the trim draw was due and owed to Crockett and thus was not a breach, then the factfinder should consider the parties' other conduct and ascertain at what point the contract was materially breached and by whom.

**{¶138}** As stated, the trial court based its decision in part on the Tracys' December 30, 2020 direction to the bank not to pay Crockett. About this same time, the Tracys also changed the locks on the property, preventing Crockett from further performing the contracted work. The court also relied on Ted's email to Crockett stating in part: "You no longer work for me. If you trespass on my property… I will contact the Carroll County Sheriff." The court emphasized the contractual language that stated, "Contractor retains complete and total control and possession of the property, as well as of sub-contractors until all monies are paid in full." (January 11, 2023 Order for Summary Judgment.)

**{¶139}** We agree that this collective conduct by the Tracys shows a material breach; however, the trial court's analysis was one-sided. It failed to consider all the

evidence as required by Civ.R. 56(C) and did not construe the evidence in the favor of the nonmoving party.

**{¶140}** Upon considering all record evidence, it is clear the parties' overlapping conduct toward the end of their working relationship shows a genuine issue of fact as to which party breached the contract and what conduct or collective conduct rose to the level of a material breach. Further, it is possible both parties were in breach. *See Jones v. Carpenter*, 10th Dist. Franklin No. 17AP-401, 2019-Ohio-619, ¶ 20; *see also Mays v. Hartman*, 81 Ohio App. 408, 412, 77 N.E.2d 93 (1st Dist.1947) (finding an issue of fact existed as to whether the first breach was committed by the defendants in refusing to pay, or whether the plaintiffs breached first by not working the next day).

**{¶141}** Accordingly, the Tracys' first assignment of error in subsection C has merit in part. The trial court's decision granting summary judgment in Crockett's favor on its breach of contract claim and dismissing the Tracys' breach of contract claim is reversed.

**{¶142}** As for the Tracys' fifth and final sub-argument, they contend the trial court erred in its determination of damages. They claim a partial award is not permissible under the plain language of the agreement and the written contract dictates Crockett is not to receive the trim draw until the work is fully performed. They also claim the trial court erred by awarding any payment or damages for Addendum work.

**{¶143}** Appellate courts review a trial court's interpretation of a contract de novo. *Kallas v. Manor Care of Barberton, OH, L.L.C.*, 9th Dist. Summit No. 28068, 2017-Ohio-76, ¶ 8. We must read a contract as a whole and ascertain the intent of each part based on considering the entirety of the agreement. *Saunders v. Mortensen*, 101 Ohio St.3d 86, 2004-Ohio-24, 801 N.E.2d 452, ¶ 16. We must give effect to each provision of the contract. *Id.*

> In construing the terms of a written contract, the primary objective is to give effect to the intent of the parties, which we presume rests in the language that they have chosen to employ. *Saunders v. Mortensen,* 101 Ohio St.3d 86, 2004-Ohio-24, 801 N.E.2d 452, at ¶ 9, citing *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 31 O.B.R. 289, 509 N.E.2d 411, paragraph one of the syllabus. 'Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless

Case No. 23 CA 0966

some other meaning is clearly evidenced from the face or overall contents of the instrument.' * * * Where the terms are clear and unambiguous, a court need not go beyond the plain language of the agreement to determine the rights and obligations of the parties. * * *.

*In re All Kelley & Ferraro Asbestos Cases*, 104 Ohio St.3d 605, 2004-Ohio-7104, 821 N.E.2d 159, ¶ 29.

**{¶144}** "[A] writing * * * will be read as a whole, and the intent of each part will be gathered from a consideration of the whole." *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.,* 78 Ohio St.3d 353, 361, 678 N.E.2d 519 (1997). "Courts should attempt to harmonize provisions and words so that every word is given effect." *Christe v. GMS Mgt. Co.,* 124 Ohio App.3d 84, 88, 705 N.E.2d 691 (9th Dist.1997).

**{¶145}** Regarding payment, the contract generally provides for progress payments, referred to as "draws." Each draw has a corresponding description and percentage amount. Although the contract neither authorizes nor forbids partial progress payments, the manner in which it is written shows the parties agreed to be bound to the payment schedule as written.

**{¶146}** "Expressio unius est exclusio alterius is an interpretative maxim meaning that if certain things are specified in a law, contract, or will, other things are impliedly excluded." *Wildcat Drilling, L.L.C. v. Discovery Oil & Gas, L.L.C.*, 172 Ohio St.3d 160, 2023-Ohio-3398, 222 N.E.3d 621, ¶ 24, quoting *State ex rel. Paluf v. Feneli*, 69 Ohio St.3d 138, 143, 630 N.E.2d 708 (1994). While the doctrine is one generally used when interpreting contractual ambiguities and is a rule of construction, some courts have used the rule when explaining why there is no ambiguity. *See Pierce Point Cinema 10, L.L.C. v. Perin-Tyler Family Found., L.L.C.*, 12th Dist. Clermont No. CA2012-02-014, 2012-Ohio-5008, ¶ 17 (holding that "specific contract provisions take precedence over more general provisions and do not create an ambiguity in a contract"). Based on the plain language of the agreement, we agree it generally does not provide for partial progress payments. Notwithstanding, this conclusion does not prevent the recovery of damages for contract work performed, if the work completed at the time of breach did not match the draw schedule.

Case No. 23 CA 0966

**{¶147}** As for the Tracys' arguments regarding the Addendum work, they claim the court erred by awarding Crockett damages or payment for work corresponding with the work outlined in the parties' Addendum. In their June 6, 2022 opposition to Crockett's summary judgment, the Tracys rely on the affidavit of Ted Tracy in which he states the invoices for subcontractors Jamison Well Drilling and OD Miller Electric were already authorized, released, and paid. (June 6, 2022 affidavit of Theodore Tracy, ¶ 23-26.) Further, the Tracys claim because Crockett did not complete any portion of the Addendum work, Crockett is not entitled to any corresponding payment.

**{¶148}** The trial court did not address the Tracys' arguments about the completion of the Addendum work or payment for the Addendum work. The trial court's judgment puts this court in the position of having to analyze the issue in the first instance. This court will not do so for the first time on appeal because that is not the function of a reviewing court. *See Four Elyria Co., LLC v. Brexton Construction, LLC*, 2022-Ohio-2989, 195 N.E.3d 1083, ¶ 72 (9th Dist.).

**{¶149}** Because we reverse for the reasons stated, we also direct the trial court to address the Tracys' arguments about the Addendum on remand, including what Addendum work was performed, what portion of the Addendum payments were paid, and to whom.

**{¶150}** In sum, we find the Tracys' first assignment of error has merit in part.

**{¶151}** Because Crockett's cross-assignments of error arise from the construction contract, we address them before the Tracys' remaining arguments regarding unjust enrichment, conversion, and the mechanic's lien under their first assigned error.

**Crockett's Cross-Assignments of Error**

**{¶152}** Crockett's first assigned error contends:

"The Trial Court erred when it limited Crockett Homes to its restitution damages for Tracy's breach of the construction agreement."

**{¶153}** Crockett's second assigned error contends:

"The trial court erred when it ignored almost twenty days of work under the Contract and considered evidence limiting Crockett Homes to work under the Contract completed as of December 11, 2020, based on an inspection report that did not comply with Civ.R. 56."

{¶154} Crockett's first assignment challenges the trial court's damage award and claims the court erred by only awarding it restitution damages. Crockett seeks expectation damages under the contract for lost profits. In addition, Crockett claims the court failed to grant Crockett damages for work performed after the December 12, 2020 K9 inspection report.

{¶155} Crockett's second assignment of error asserts the trial court erred by relying on the December 12, 2020 K9 inspection report. Crockett claims to have completed work after this date. It also claims the trial court erred in its reliance on this report, which did not comply with Civ.R. 56(C).

{¶156} Since we are reversing and remanding on the Tracys' assignment of error regarding breach, our review of the court's damages determination is premature and not ripe for review. *State ex rel. Dunn v. Plain Local School Dist. Bd. of Education*, 158 Ohio St.3d 370, 2020-Ohio-40, 143 N.E.3d 488 (A claim is not justiciable if it rests on contingent events that may not occur.)

{¶157} Notwithstanding, we note damages for breach of contract should place the injured party in as good a position as it would have occupied absent the breach. *Bd. of Education Toronto City Schools v. Am. Energy Utica, LLC*, 2020-Ohio-586, 152 N.E.3d 378, ¶ 63 (7th Dist.). The Supreme Court has explained:

> In an action on the contract, plaintiff is entitled only to recover damages for defendant's breach of contract. Such damages may include the further compensation plaintiff would have received under the contract if it had been performed, less the value to plaintiff of his being relieved of the obligation of completing performance. * * *
>
> Where a plaintiff sues on a contract to recover the amount he would have received for the full performance thereof which was prevented by a defendant's breach, he seeks in effect to recover as damages the profit from performance of the contract that defendant's breach prevented him from earning.
>
> In such a case, plaintiff has the burden of alleging and proving not only (a) what he would have received under the contract from the performance so prevented, but also (b) what such performance would have cost him (or the value to him of

relief therefrom).  Unless he proves both of those facts, he cannot recover as damages the profits he would have earned from full performance of the contract. *Allen, Heaton & McDonald, Inc., v. Castle Farm Amusement Co.*, 151 Ohio St. 522, 86 N.E.2d 782 (1949), syllabus.

{¶158}  In light of our decision regarding the Tracys' first assignment of error, we decline to address Crockett's arguments on appeal.

Unjust Enrichment

{¶159}  Under their first assignment of error subsection D, the Tracys claim the trial court erred by awarding Crockett damages for unjust enrichment for change orders that the Tracys did not sign.  They argue because the contract required any change orders to be written and executed, equity cannot provide Crockett relief.  We disagree in part.

{¶160}  To prove unjust enrichment, one must show he conferred a benefit upon another; the other party was aware of the benefit conferred; and the other party retained the benefit under circumstances where it would be unjust to do so without payment. *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183, 465 N.E.2d 1298 (1984).

{¶161}  As the Tracys contend, Ohio law does not generally permit recovery under the theory of unjust enrichment when an express contract covers the same subject matter. *Bunta v. Superior VacuPress, L.L.C.*, 171 Ohio St.3d 464, 2022-Ohio-4363, 218 N.E.3d 838, ¶ 36.  The equitable doctrine does not supply an implied contractual relationship between parties who have reached an express contractual agreement.  *Id.* at ¶ 39.

{¶162}  The contract here unequivocally requires any deviations from the contract to be in a change order signed by the parties before changes were made.

{¶163}  However, contract provisions, including no oral contract modifications clauses, may be waived. *Zanesville Glass Supply, Inc. v. Goff*, 5th Dist. Muskingum No. CT2007-0026, 2008-Ohio-1243, ¶ 35-36, citing *Expanded Metal Fire Proofing v. Noel Constr. Co.*, 87 Ohio St. 428, 440 (1913).  Proof of waiver must be either in writing or by clear and convincing evidence.  *Id.* citing *Ashley v. Henahan*, 56 Ohio St. 559, paragraph five of the syllabus (1897).

{¶164}  It is undisputed that Julie was authorized to make certain changes to the home construction contract.  Ted agreed he authorized her to make certain changes.  But in his affidavit, he stated he did not sign the change orders as drafted because they were

"inaccurate." (June 6, 2022 affidavit of Theodore Tracy, ¶ 23-26.)  Julie expressed her changes to Crockett, who made the changes as advised.  There is no evidence to the contrary.  Thus, to the extent the trial court employed the doctrine of unjust enrichment to compensate Crockett for additional work and change order items, we find no error.

{¶165}  Notwithstanding, the Tracys did challenge and continue to challenge the costs associated with the changes.  They assert Crockett's unjust enrichment claim fails to account for several contract allowances they were owed by Crockett, including a $10,800 wood burning fireplace.  Thus, an issue of fact exists as to whether Crockett conferred a benefit on the Tracys, such that it would be unjust not to compensate Crockett.

{¶166}  Based on the foregoing, we find summary judgment was improper, and this argument has merit in part.

Conversion

{¶167}  In subsection E of their first assignment of error, the Tracys challenge the court's determination that Crockett's conversion claim had merit.  They assert because Crockett delivered the jacuzzi tub pursuant to the parties' contract, and the Tracys did not prevent Crockett from retrieving the item, conversion is inapplicable.  They claim they still have the tub, and they did not deny Crockett access to it.  Instead, they moved it from their garage into their pole barn, which incorrectly made Crockett believe they disposed of it.

{¶168}  The trial court found the Tracys act of locking Crockett out of the property prevented them from using the tub for a different customer and this converted the property.  We disagree.

{¶169}  "Conversion is an exercise of dominion or control wrongfully exerted over property in denial of or under a claim inconsistent with the rights of another." *Joyce v. Gen. Motors Corp.*, 49 Ohio St.3d 93, 96, 551 N.E.2d 172 (1990).  To establish a conversion, one must show:  "(1) plaintiff's ownership or right to possession of the property at the time of conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages." *6750 BMS, L.L.C. v. Drentlau*, 2016-Ohio-1385, 62 N.E.3d 928, ¶ 28 (8th Dist.).

Case No. 23 CA 0966

If the defendant came into possession of the property lawfully, the plaintiff must prove two additional elements * * *: (1) that the plaintiff demanded the return of the property after the defendant exercised dominion or control over the property; and (2) that the defendant refused to deliver the property to the plaintiff. *R & S Distrib., Inc. v. Hartge Smith Nonwovens, L.L.C.,* 1st Dist. Hamilton No. C–090100, 2010-Ohio-3992, 2010 WL 3365800, ¶ 23. The measure of damages in a conversion action is the value of the converted property at the time it was converted. *Tabar v. Charlie's Towing Serv.,* 97 Ohio App.3d 423, 427–428, 646 N.E.2d 1132 (8th Dist.1994).

*Id. Accord Fid. & Deposit Co. of Maryland v. Farmers & Citizens Bank of Lancaster*, 72 Ohio App. 432, 434, 52 N.E.2d 549 (5th Dist.1943).

**{¶170}** "[I]n the absence of some specific legal duty to deliver or forward the property, some affirmative act on the part of the defendant is usually required to constitute a conversion." (Citation omitted.) *Ohio Tel. Equip. & Sales, Inc. v. Hadler Realty Co.*, 24 Ohio App.3d 91, 93, 493 N.E.2d 289 (10th Dist.1985).

**{¶171}** It is undisputed the Tracys lawfully came into possession of the tub when it was delivered to their home. Julie changed the color of the tub, so this one was no longer needed. Thereafter, the Tracys changed the locks and relocated the tub elsewhere on their property. Crockett did not demand or request access to the home to retrieve it. The Tracys were not asked to return it to Crockett.

**{¶172}** Although the parties' agreement dictated Crockett was to be in control of the premises during construction, the acts of changing the locks and relocating the tub on the same premises do not show the Tracys converted the property. There was never a demand and refusal for return of the item. Further, despite the Tracys' decision to change the locks, Crockett was able to secure its tools and equipment thereafter. Accordingly, summary judgment was not warranted in Crockett's favor on its conversion claim.

Mechanic's Lien

**{¶173}** The Tracys' final argument in their first assigned error, under section F, contends the mechanic's lien must be invalidated because the lien affidavit states Crockett is owed $65,238.08. They claim the lien is invalid since strict compliance with

R.C. 1311.06 is required, and the trial court was not permitted to modify the lien amount consistent with its damages award.

**{¶174}** The Tracys additionally claim any lien should only be in the amount of damages for breach of contract, i.e., $25,573.38, and not the additional damages for conversion and unjust enrichment. Crockett counters and asserts an error in the lien amount does not invalidate a mechanic's lien.

**{¶175}** Because genuine issues of fact exist regarding the Crockett's and the Tracys' competing claims, the amount of damages, if any, is uncertain. Thus, we decline to review the merits of this argument since it is not ripe for review. *See State ex rel. Dunn v. Plain Local School Dist. Bd. of Education*, 158 Ohio St.3d 370, 2020-Ohio-40, 143 N.E.3d 488, ¶ 18 (A claim is not ripe if it rests on events that may not occur.)

<u>Breach of the Loan Documents</u>

**{¶176}** The Tracys' second assignment of error contends:

"The trial court erred in granting summary judgment to the Appellee, Consumers National Bank."

**{¶177}** The Tracys argue issues of fact exist that preclude summary judgment in Consumers' favor on its breach of contract claim. They list and challenge three reasons the trial court found they were in breach of the loan documents, i.e., failure to complete construction by February of 2021; failure to provide proper lien waivers; and refusing to sign the hold harmless agreement.

**{¶178}** In its May 3, 2023 judgment, the trial court listed two additional ways it found Ted in breach. It stated in part that Ted failed to use "best efforts" to ensure Crockett diligently continued the contract work and he also violated the terms of the agreement by directing Crockett to make contract changes without the bank's approval. Because these findings are not discussed in the Tracys' assigned errors, we do not address them.

**{¶179}** First, the Tracys contend they were legally excused from performing their contract obligations with the bank since Crockett failed to timely perform under the construction contract and abandoned the contract work. The Tracys claim Crockett's breach or abandonment caused the construction to be incomplete by February 2021. There is no dispute that the construction was not completed by this date.

**{¶180}** As stated, the Construction Loan Agreement states in part:

2.1.5.  Completing the Work. * * *  I will use my best efforts to ensure the Contractor continues the Work diligently and in a commercially reasonable and workmanlike manner *  * *.

* * *

I acknowledge that the Construction Contract represents that the Work will be completed on or before February 12, 2021 *  * * but no later than twelve (12) months after the loan closing. * * *

**{¶181}** As stated, the elements for a breach of contract include:  "(1) the existence of a contract, (2) plaintiff fulfilled his or her contractual obligations, (3) defendant failed to fulfill his or her contractual obligations, and (4) due to this failure plaintiff incurred damages." *Brock v. Servpro*, 2022-Ohio-158, 183 N.E.3d 491, ¶ 31 (12th Dist.).

**{¶182}** The Tracys generally cite to *Natl. City Bank of Cleveland v. Erskine & Sons*, 158 Ohio St. 450, 110 N.E.2d 598 (1953) paragraph one of the syllabus, for the contention they were "legally excused" from performing their contractual obligations.  It states:  "The wor[d], 'breach,' as applied to contracts is defined as a failure *without legal excuse* to perform any promise which forms a whole or part of a contract, including the refusal of a party to recognize the existence of the contract or the doing of something inconsistent with its existence." (Emphasis added.) *Id.*  The Tracys provide no other legal authority or analysis in support of their assertion they are excused due to Crockett's breach except the reference to *Erskine & Sons*.

**{¶183}** Examples of legal defenses to a breach claim that may excuse a party from performance under a contract include impossibility, unconscionability, and repudiation.  *See Lawless v. Bd. of Education of Lawrence Cnty. Educational Serv. Ctr.*, 2020-Ohio-117, 141 N.E.3d 267, ¶ 51; *Starlion Elecs. Distrib., L.L.C. v. Zoran Med., L.L.C.*, 8th Dist. Cuyahoga No. 112133, 2023-Ohio-2876, ¶ 31.  The Tracys do not, however, identify what "legal excuse" applies here that allows them to avoid their contract obligations.

**{¶184}** An appellant bears the burden of identifying law and argument in support of an assigned error.  App.R. 16(A)(7).  Because the Tracys fail to identify law and

Case No. 23 CA 0966

corresponding argument showing what legal excuse applies, we find this argument lacks merit.

**{¶185}** The Tracys also argue they used "best efforts" to ensure the construction was complete by the contract deadline, but notwithstanding, the construction was incomplete based on Crockett's failure to perform. Thus, they claim an issue of fact remains.

**{¶186}** Without addressing whether the evidence portrays the Tracys employing "best efforts," we conclude that the "best efforts" language in the Construction Loan Agreement does not modify Ted's acknowledgment that the construction will be complete by the agreed upon deadline.

**{¶187}** Instead, the plain language of Section 2.1.5. Completing the Work shows Ted agreed to use his "best efforts to ensure the Contractor continues the Work diligently and in a commercially reasonable and workmanlike manner * * *." Two sentences later, the agreement states Ted acknowledges construction is to be completed on or before February 12, 2021 or no later than twelve months after closing. For this reason, this argument lacks merit.

**{¶188}** Regarding the lien filed against the property, the Tracys assert they contested Crockett's lien and defended against its enforcement. Thus, they claim they were in compliance with this aspect of the loan documents. Consistent with their argument, the Open-End Mortgage states in part under Uniform Covenants:

> 4. Charges; Liens.
>
> Borrower shall promptly discharge any lien which has priority over this Security Instrument *unless* Borrower: (a) agrees in writing to the payment of the obligation by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) *contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings* which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Interest. If Lender determines that any portion of the Property is subject to

Case No. 23 CA 0966

a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days * * *, Borrower shall satisfy the lien or take one or more of the actions set forth above in Section 4.

(Emphasis added.)

**{¶189}** We agree. The evidence shows the Tracys have contested the lien and defended against it before and during these proceedings, which remain pending. Consumers does not address this specific argument, but generally contends Ted breached this provision due to the *existence* of Crockett's lien against the property. To the extent the trial court found the Tracys breached for the failure to comply with this section of the mortgage, we find error.

**{¶190}** Next, the Tracys contend the trial court erred by concluding they failed to provide the bank with properly completed lien waivers. The Tracys say they performed under the contract, but Crockett's failure to submit an executed lien waiver caused the nonpayment of the reduced trim draw.

**{¶191}** However, this is not the lien waiver Consumers claims violated the loan documents. Consumers claim Ted submitted improper lien waivers for the subcontractors who performed work on the property after the Tracy-Crockett relationship ended.

**{¶192}** Ted requested loan funds to pay these subcontractors. However, according to Crockett, when asked for updated affidavits reflecting the work was completed, Ted resubmitted the previously submitted and executed lien waivers with handwritten changes that were not re-verified. One lien waiver had a notation stating, "work completed on 4/10/21," yet that waiver was certified and sworn on March 26, 2021. The other lien waiver was also evidently modified after it had been verified. It stated "work completed," and the words "paint trim misc." were crossed out. (Tracy Depo., Ex. B, C, D, & E.)

**{¶193}** Consumers argues proper lien waivers are necessary to ensure its loan had priority, and Ted's failure to provide proper waivers jeopardized its loan priority. The Tracys do not dispute the factual predicate of this argument, and as such, we find no error. This argument lacks merit.

Case No. 23 CA 0966

**{¶194}** The Tracys also contend genuine issues of material fact exist about Ted's refusal to sign the bank's release and hold harmless agreement. They claim he did not sign this additional contract because it was consideration for a loan modification that he already signed. Thus, he claims there was "no consideration" for him to sign. They also claim this one-sided and draconian release and hold-harmless agreement was well beyond the scope of the clause to "signing other necessary documents" in the Construction Loan Agreement. Because it was a release of all liability and beyond the scope of the loan document requirements, he refused to sign it.

**{¶195}** As stated, Under Section 4. General, the Construction Loan Agreement states:

> 4.1 My Cooperation. Lender may require that I sign other instruments or documents * * * that it considers necessary to accomplish the purpose of this Loan Agreement. I will sign such documents * * * at my own cost and expense.

**{¶196}** "Terms in a contract are ambiguous if their meanings cannot be determined from reading the entire contract, or if they are reasonably susceptible to multiple interpretations." *Tera, LLC v. Rice Drilling D, LLC*, 2023-Ohio-273, 205 N.E.3d 1168, ¶ 39 (7th Dist.), citing *First Natl. Bank of Pennsylvania v. Nader*, 2017-Ohio-1482, 89 N.E.3d 274, ¶ 25 (9th Dist.) When a contract provision is unclear or lacks definiteness, a court must employ the canons of contract construction to ascertain the parties' intent. *Owusu v. Hope Cancer Ctr. of Northwest Ohio, Inc.*, 3rd Dist. Allen No. 1-10-81, 2011-Ohio-4466, ¶ 16 (vague contract term requires employing rules of contract construction).

**{¶197}** It is undisputed that Ted agreed to sign other documents "that [the bank] consider[ed] necessary to accomplish the purpose of this Loan Agreement." However, we conclude this provision is ambiguous since it is unclear what it required Ted to do to be in compliance. In light of the facts here, this provision must be interpreted before we can determine whether Ted's refusal was a violation.

**{¶198}** Moreover, because this issue is neither briefed nor argued by the parties, we will not analyze the meaning of the provision. *See* App.R. 12(A)(1)(b). Thus, we reverse and remand for the trial court to address the meaning of the provision and whether the hold harmless agreement was beyond the scope of that provision. Based on the

foregoing, this argument has merit. The trial court erred by finding via summary judgment that Ted was in violation of this provision.

{¶199} Finally, the Tracys summarily assert that because summary judgment was not warranted in Crockett's favor, their affirmative claims against the bank should be reinstated.

{¶200} The Tracys' argument in this regard is comprised of two sentences with no legal authority or analysis. Notwithstanding, the Tracys asserted claims against Consumers for negligent misrepresentation and indemnification.

> The elements of negligent misrepresentation are (1) one who, in the course of his or her business, profession, or employment, or in any other transaction in which he or she has a pecuniary interest; (2) supplies false information for the guidance of others in their business transactions; (3) is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information; and (4) if he or she fails to exercise reasonable care or competence in obtaining or communicating the information. *Delman v. Cleveland Hts.* (1989), 41 Ohio St.3d 1, 4, 534 N.E.2d 835, 837-838.
>
> A negligent misrepresentation claim does not lie for omissions: there must be an affirmative false statement. *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.* (1996), 115 Ohio App.3d 137, 149, 684 N.E.2d 1261, 1269; *Zuber v. Ohio Dept. of Ins.* (1986), 34 Ohio App.3d 42, 45-46, 516 N.E.2d 244, 246-248.

*Martin v. Ohio State Univ. Found.*, 139 Ohio App.3d 89, 103-04, 742 N.E.2d 1198 (10th Dist.2000).

{¶201} The Tracys generally contend Consumers refused to release funds to pay for their subsequent contractor's work despite the bank's promises. They claimed to have justifiably relied on Consumers' assurances that it would disburse the funds when the Tracys hired additional contractors. However, the bank cited other issues as resulting in its decision not to release additional loan funds, e.g., improper lien waivers and Ted's refusal to sign the release.

Case No. 23 CA 0966

**{¶202}** Furthermore, in response to Consumers' motion for summary judgment, the Tracys did not come forward with evidence tending to show that Consumers made affirmative false statements on which they justifiably relied. Civ.R.56(E). Consequently, we agree with the trial court's decision.

**{¶203}** The Tracys' second cross-claim against Consumers asserted they were entitled to indemnification and/or contribution from Consumers regarding any judgment or liability the Tracys owed to Crockett. (June 24, 2021 Cross-Claim.) However, the Tracys have come forward with no law or evidence tending to support their clam for indemnification and/or contribution. Civ.R. 56(E) (nonmoving party has a reciprocal burden of coming forward with evidence showing a genuine issue of fact remains for trial.)

**{¶204}** It is not the function of an appellate court to identify law in support of an argument on appeal. App.R. 16(A)(7); *Matter of E.T.*, 2023-Ohio-444, 208 N.E.3d 910, ¶ 57-58 (7th Dist.). It is an appellant's burden to affirmatively demonstrate error on appeal. *Kremer v. Cox*, 114 Ohio App.3d 41, 60, 682 N.E.2d 1006 (9th Dist.1996).

**{¶205}** Here, the loan documents provided for the bank's indemnification against Ted, not for Ted to be indemnified by Consumers. In light of their failure to direct our attention to authority showing they had the right to be indemnified by the bank, we find no error with the court's entering judgment against the Tracys on this claim.

**{¶206}** As for the bank's claims against Ted, we find error in part. The trial court erred by finding a breach of Section 4. Charges; Liens of the Open-End Mortgage.

**{¶207}** We likewise conclude the court erred by finding Ted breached for failing to sign the hold harmless agreement. The trial court must determine in the first instance the meaning of the contract provision and whether the hold harmless agreement was beyond the scope of the loan documents.

**{¶208}** Although we find certain aspects of the trial court's decision regarding the loan documents were erroneous, our conclusion finding error has no impact on the other aspects of the trial court's decision finding Ted breached.

Conclusion

**{¶209}** The trial court erred by holding no genuine issue of fact existed as to which party (Crockett or Ted) breached the construction contract and what conduct or collective conduct constitutes a material breach. Further, we reverse the trial court's

decision regarding the breach of the Addendum and remand for it to address the Tracys' arguments regarding the Addendum.

**{¶210}** Regarding Crockett's unjust enrichment claim, we conclude summary judgment was improper because an issue of fact exists as to whether Crockett conferred a benefit on the Tracys, such that it would be unjust not to compensate Crockett. Accordingly, this argument has merit in part.

**{¶211}** Additionally, for the reasons stated, we find summary judgment was not warranted in Crockett's favor on its conversion claim.

**{¶212}** The trial court's decision granting summary judgment in Crockett's favor on its claims and dismissing the Tracys' breach claim is vacated. The claims are reinstated, and the case is remanded for further proceedings.

**{¶213}** We affirm the trial court's decision granting summary judgment in Consumers' favor as to the Tracys' affirmative claims against it. We affirm in part and reverse in part the trial court's decision regarding Consumers' claims against Ted and remand for further proceedings.

Hanni, J., concurs.

Klatt, J., concurs.

———————————————

For the reasons stated in the Opinion rendered herein, it is the final judgment and order of this Court that the trial court's decision granting summary judgment in Crockett's favor on claims and dismissing the Tracys' breach claim is vacated; and the claims are reinstated. We affirm the trial court's decision granting summary judgment in Consumers' favor as to the Tracys' affirmative claims against it. We affirm in part and reverse in part the trial court's decision regarding Consumers' claims against Ted. We hereby remand this matter to the trial court for further proceedings according to law and consistent with this Court's Opinion. Costs to be taxed equally against the Appellee/Cross–Appellant Crockett Homes, Inc. and Appellee Consumers National Bank.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**